667 So.2d 1070 (1995)
STATE of Louisiana
v.
Jonathan HAWKINS.
No. 90-KA-1235.
Court of Appeal of Louisiana, Fourth Circuit.
September 15, 1995.
Rehearing Denied February 22, 1996.
*1074 Harry F. Connick, District Attorney of Orleans Parish, Val M. Solino, Assistant District Attorney of Orleans Parish, New Orleans, Louisiana, for appellee.
Michael F. Barry, New Orleans, Louisiana, for defendant/appellant.
Before CIACCIO, ARMSTRONG and LANDRIEU, JJ.
LANDRIEU, Judge.
On March 2, 1989, the defendant, Jonathan Hawkins, was indicted for the first degree murder of Samuel Klingensmith while in the perpetration or attempted perpetration of an armed robbery in violation of La.Rev.Stat. Ann. 14:30(A)(1) (West 1995 Pocket Part). At his arraignment on March 6, 1989, the defendant entered a plea of not guilty. On February 8, 1990, after a three day jury trial, the defendant was found guilty as charged. After the sentencing phase of the trial on February 9, 1990, the jury recommended that the defendant serve a sentence of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. After waiving all legal delays, the defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.

STATEMENT OF THE FACTS
Around 10:00 p.m. on October 13, 1986, Tulane University Professor Samuel Klingensmith was shot and killed near the corner of Freret and Adams Streets. Several residents in the area heard a gunshot and came out to investigate. Henry Hayes came out, saw the victim lying on the sidewalk, placed the victim's briefcase under his head for comfort, and was with him when he died. Hayes did not see anyone fleeing the scene. Louis Otto, who lives on Burdette Street, went outside with his son Kevin and saw an unknown black male run around the corner from Freret Street onto Burdette, run one hundred feet on Burdette then slow to a walk the remaining two-thirds of the block to Zimpel Street. Otto and his son saw the black male throw something into the bushes as he approached Zimpel Street and then turn onto Zimpel. Otto saw the suspect unmasked but could only describe him in general terms. When the man was out of sight, Otto and his son went over to the bushes and looked on the ground for the object but found nothing in the dark. The next morning, after reading about the murder in the newspaper, Otto went around the corner to the crime scene and told a detective what he had seen the night before. Otto showed the officer the bushes where the man had thrown something. The officer found the victim's wallet inside the bushes and crime lab technician, Gregory Migaud, was summoned to collect it.
New Orleans Police Officers Gary Scioneaux and Glenn Banks were the first police on the scene. When they arrived, the victim was lying on the sidewalk with a briefcase under his head. The officers secured the scene for the homicide detectives and the crime lab technicians. Homicide Detective Norman McCord arrived and took charge of the investigation. Crime Lab Technician John Treadway took photographs and collected physical evidence. McCord was able to locate only one eyewitness, Troy Jupiter.
Hugh Straub and Rev. David Cameron, who, with their wives, were driving together on Hillary Street in a lake-ward direction at approximately 10:00 p.m. the night of the murder. As the two couples approached the Freret intersection, they saw a man walking from their right on Freret Street. The man had a white handkerchief draped mask-like over his nose, which he pulled down as the car entered the intersection, and kept his left hand under his shirt. After passing him, Straub observed that the man had a gun in his hand. The two couples then went directly to Straub's house and called 911 to report what they had seen. After learning of the shooting the next day, Straub and Cameron contacted the police. Detective McCord interviewed the two men and *1075 arranged a session with police artist Johnny Donnels, resulting in a composite sketch of the suspect.
On October 28, 1986, Tulane University announced a $10,000 reward for information leading to conviction in the case. The same day, the police received an anonymous telephone tip naming a Roy Mason as the perpetrator. Detective McCord located a mugshot of Roy Mason and included the photograph in a photographic lineup shown to Troy Jupiter. Jupiter was not able to identify anyone in the photographic lineup as a possible suspect. In early November 1986, Detective McCord received another anonymous tip indicating that a Renaud Courtney was the perpetrator. McCord prepared a photographic lineup including Courtney's mugshot. The lineup was shown to Jupiter, Straub, and Cameron. None of the men identified Courtney as the perpetrator.
In late 1988, the police received another anonymous telephone call indicating that Charmaine, Germaine, and Karen Carter, who resided in the 2500 block of Governor Nicholls, were in a car with Jonathan Hawkins when Hawkins committed the crime. On February 27, 1989, Detectives McCord and Marco Demma contacted the Carter sisters. The women gave statements to the officers implicating the defendant as the perpetrator of the murder. The women testified at trial that they were home the evening of October 13, 1986, when the defendant stopped by and asked them to take a ride with him. While they were out, the defendant stopped at his home. The women waited in the car while the defendant went inside. When he returned to the vehicle, he was holding a gun wrapped in a white towel. They then drove around the uptown area until they saw a man walking on Freret. Hawkins stopped the vehicle and got out, taking the weapon with him. The defendant walked past the man, then doubled back and confronted him. When the shooting occurred, the women became frightened and drove home. The defendant arrived at the women's house shortly thereafter. He explained that he shot the man because he wouldn't "give it up."
Detective McCord showed the women Hawkins' mugshot. Each of the women identified Hawkins and initialled the photograph. On February 27, 1986, McCord arrested the defendant. The officers did not locate the murder weapon during a search of the defendant's residence.

DISCUSSION

Errors Patent
A review of the appellate record reveals one possible error patent. Judge George Perez was serving as Ad Hoc Judge for Section "E" at the time this case was tried. The voir dire transcript indicates that he informed the prospective jurors that they would be sequestered for the entire trial, but there is nothing in the record to affirm that they were, in fact, sequestered. On July 18, 1995, this court received a per curiam from Judge Calvin Johnson, the trial judge presently sitting in Section "E" of Criminal District Court, stating that he has no information as to whether the jury was sequestered.
"Whether a patent error, like other statutory error, requires reversal must be evaluated in light of the potential impact on the fairness of the proceedings." State v. Schrader, 518 So.2d 1024, 1037-38 (La.1988), cert. denied, Schrader v. Whitley, 498 U.S. 903, 111 S.Ct. 265, 112 L.Ed.2d 221 (1990) (quoting State v. White, 404 So.2d 1202, 1204-05 (La.1981)). A defendant facing a death penalty in a capital case is statutorily entitled to a sequestered jury. La.Code Crim.Proc.Ann. art. 791 (West 1981) provides:
A. A jury is sequestered by being kept together in the charge of an officer of the court so as to be secluded from outside communication, except as permitted by R.S. 18:1307.2.
B. In capital cases, after each juror is sworn he shall be sequestered.
C. In noncapital cases, the jury shall be sequestered after the court's charge and may be sequestered at any time upon order of the court.
In this case, Hawkins did not receive the death penalty. An experienced ad hoc *1076 judge tried the case and warned the jurors that they would be sequestered. There is nothing in the record to indicate that they were not sequestered, nor did the defendant object at trial or raise the issue as an assignment of error on appeal.
The failure to sequester a jury is a statutory error. Except where the penalty of death has been imposed, it is not an error requiring automatic reversal. It is an error subject to the contemporaneous objection rule and one which, on appeal, must be evaluated in terms of fundamental fairness. Even if we accept as fact that the jury was not sequestered, we find that the error was harmless and did not impact the fundamental fairness of the proceedings.

Assignments of Error Nos. 1, 2, 3, 4, 28, 29, 31, 32 and 65
In these assignments of error, the defendant argues that the State withheld Brady information from him. The due process clause of the Fourteenth Amendment to the United States Constitution requires the disclosure upon request of evidence which is favorable to the accused when the evidence is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). This rule has been expanded to include evidence which impeaches the testimony of a witness where the reliability or credibility of the witness may be determinative of guilt or innocence. Giglio v. U.S., 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). The Brady rule is based on due process of law. "[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment." State v. Rosiere, 488 So.2d 965, 970 (La.1986). The test for determining materiality was established in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682, 105 S.Ct. at 3383. The test for determining materiality is the same whether or not the defense makes a pretrial request for exculpatory evidence. Id. at 683, 105 S.Ct. at 3384.
Defendant argues that the State failed to inform him prior to trial that (1) "photographic lineup" displays were made three months after the crime to Hugh Straub who picked two "possibles"; (2) tips to police and/or Crimestoppers implicated two suspects other than Hawkins as the perpetrator; (3) a .38 revolver found in Hawkins' possession in an unrelated arrest two weeks after the murder was ballistically compared (with negative results) with the .38 bullet retrieved from the victim's body; and (4) a mugshot of Hawkins was displayed to Karen, Charmaine and Germaine Carter for identification purposes.
The information allegedly withheld by the state must be "material" to the defendant's guilt or innocence to constitute Brady evidence. That is, there must be a reasonable probability that, had the evidence been disclosed, there would be a difference in the outcome. The photographic lineup shown to Hugh Straub is not exculpatory evidence and/or material to the defendant's case. The trial transcript reveals that Mr. Straub was presented with a photographic lineup which included a photograph of Renaud Courtney. The defendant was not included in this photographic array. Further, Mr. Straub informed Detective McCord that none of the men shown in the lineup was the person he and Rev. Cameron saw on the night of the murder.
While the defendant argues that he did not know of the anonymous tips from Crimestoppers naming other suspects, defendant acknowledged at trial that he knew of at least one other suspect. Further, evidence of the two Crimestoppers tips and the names of the alleged suspects were presented to the jury. The alleged failure to provide the defense with the facts of other Crimestoppers tips would not have resulted in a different outcome.
*1077 The results of the ballistics tests were provided to the defendant immediately prior to trial. Defendant knew of the existence of the gun well before trial as the weapon had been found in his possession during an unrelated arrest. When the State gave the defendant the information on the ballistics tests, the State informed the defendant that it did not intend to use the tests as evidence. Thus, the test results were provided to the defendant prior to trial. The defendant had the opportunity to introduce the test results himself. However, in doing so, he would have introduced evidence of his unrelated arrest.
The defendant further contends that the State withheld information that the defendant's mugshot was shown to the Carter sisters. Such evidence is clearly not Brady material. The Carter sisters knew the defendant personally and had named the defendant as the perpetrator prior to the police showing them the mugshot of the defendant.
The defendant also argues that the trial court erred when it denied the defendant's motion for mistrial when Hugh Straub testified that he was shown a photographic lineup. Defendant sought the mistrial on the basis that such evidence was Brady material which should be disclosed to him prior to trial. However, as stated above, such testimony does not constitute Brady material. Mr. Straub testified that he was unable to identify the perpetrator from the photographs used in the lineup. In addition, the defendant's photograph was not included in the photographic lineup. Therefore, the trial court did not err in denying the defendant's motion for mistrial.
The defendant further contends that the trial court erred in denying his request for the rap sheets of Roy Mason, Renaud Courtney, and Dwayne Payton as well as part of the supplemental report prepared by Detective McCord. The trial court correctly found that the rap sheets were not relevant to the defendant's guilt or innocence. Detective McCord testified that none of the witnesses were able to identify the perpetrator from the two photographic lineups which included the photographs of Roy Mason and Renaud Courtney. Thus, Mason and Courtney were no longer viable suspects. In regards to Dwayne Payton, Detective McCord testified that he never received a Crimestoppers tip implicating Dwayne Payton as a possible suspect. No evidence was submitted to indicate that Payton was a possible suspect. As to the supplemental police report, the defendant has not shown that there is information in the supplemental police report which would constitute Brady material.
The defendant also attempts to argue that the trial court erred in allowing the trial to proceed without the state providing defense counsel with copies of the photographs used in each of the photographic lineups. Specifically, the defendant assigns as error the trial court allowing Charmaine Carter to testify before the defendant received the photographs and denial of defendant's request for a recess until the State was able to produce the photographs. The defendant has not shown how such alleged errors prejudiced him. Detective McCord stated that the eyewitnesses were not able to identify the perpetrator from the lineups and that the lineups did not include the defendant's photograph. Thus, the photographs used in the lineups do not constitute exculpatory evidence to which the defendant was entitled. There was no error in the trial court's rulings.
Defendant lastly argues that the trial court erred in denying his motion for a new trial. Defendant based his motion for a new trial on the failure and/or delay of the state to produce Brady information. As stated above, the State provided the defendant with all possible exculpatory evidence prior to trial. Defendant received the ballistics report prior to trial. The information on the other alleged suspects was not exculpatory since the eyewitnesses were not able to identify any of them as the perpetrator. Defendant's mugshot was clearly not exculpatory as the Carter sisters positively identified the defendant as the perpetrator. Therefore, the trial court did not err in denying the defendant's motion for a new trial.
These assignments of error are without merit.

*1078 Assignments of Error Nos. 5 through 24[1]
These assignments of error concern challenges for cause made by the State and defense during voir dire. The defendant contends that the trial court erred in granting the State's challenges for cause as to veniremen Keith Lee, Lorraine Jones, Joan McNeil, Eddie Farley, Leo Stewart, Jr., Clarence J. Arceneaux, Harry Ballard, Barbara Phillips, Christine Brister, Bobbie Jean Smith, Ernest L. Wann, Monica Morgan, and Jettina Hopkins. The defendant further argues that the trial court erred in denying his challenges for cause as to veniremen Silas Walker, Willie Young, Sr., Roderick Blouin, Christopher Cusimano, Leroy Boudreaux and Bruce Foy. Defendant suggests that the trial court should have granted the defendant's challenges as these men were in favor of the death penalty in all cases. The defendant believes that the trial court also erred in allowing the State to discuss other cases during voir dire.
The state challenged Keith Lee on the basis that Mr. Lee could not consider a sentence of life imprisonment during the penalty phase. He felt that the only possible punishment should be the death penalty. Veniremen Lorraine Jones, Joan McNeil, Eddie Farley, Leo Stewart, Jr., Clarence J. Arceneaux, Harry Ballard, Barbara Phillips, Christine Brister, Bobbie Jean Smith, Ernest L. Wann, Monica Morgan and Jettina Hopkins were challenged for cause by the state because these prospective jurors stated during voir dire that they could not consider the death penalty. They were opposed to the death penalty on personal, philosophical, and religious grounds.
The United States Supreme Court in Witherspoon v. Illinois, 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968), held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Under Witherspoon, only a juror who would automatically vote against the death penalty may be excluded for cause. "The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." Id. at 522, 88 S.Ct. at 1777 n. 21; See also La.Code Crim. Proc.Ann. art. 798 (West Supp.1995); State v. Celestine, 443 So.2d 1091, 1093-94 (La.1983), cert. denied, Celestine v. Louisiana, 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 154 (1984).
Further, under La.Code Crim.Proc.Ann. art. 797 (West 1981),
[t]he state or the defendant may challenge a juror for cause on the ground that:
(1) The juror lacks a qualification required by law;
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court; or
(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.
"Prejudice is presumed when a challenge for cause is erroneously denied and *1079 all of defendant's peremptory challenges are exhausted. A trial court's erroneous ruling which deprives the defendant of a peremptory challenge substantially violates that defendant's rights." State v. Ross, 623 So.2d 643, 644 (La.1993). To prove that there has been reversible error, the defendant need only show that there was an erroneous denial of a challenge for cause, and that he used all of his peremptory challenges. Id.; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278 (La.1994).
However, the trial judge is vested with broad discretion in ruling on challenges for cause. His rulings will be reversed only when a review of the entire voir dire reveals that the judge's exercise of discretion was arbitrary and unreasonable with resultant prejudice to the defendant. State v. Knighton, 436 So.2d 1141, 1148 (La.1983), cert. denied, Knighton v. Louisiana, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984).
In the present case, the trial court granted the State's challenges for cause because the veniremen indicated that they could not vote for the death penalty in any situation. Each of the prospective jurors were questioned extensively by the state, the defendant and the trial judge. Despite defendant's attempts to rehabilitate these jurors, each stated that they could not impose the death penalty and would not, in any circumstance, vote for the death penalty. Thus, the trial court was correct in granting the State's challenges for cause of Lorraine Jones, Joan McNeil, Eddie Farley, Leo Stewart, Jr., Clarence J. Arceneaux, Harry Ballard, Barbara Phillips, Christine Brister, Bobbie Jean Smith, Ernest L. Wann, Monica Morgan and Jettina Hopkins.
The State also sought to challenge venireman Keith Lee for cause. Mr. Lee stated that in a first degree murder case, he would automatically vote for the death penalty. He could not consider life imprisonment as a possible sentence if mitigating factors were found. The juror stated that he could not accept the law as given in regards to the possibility of life imprisonment. Accordingly, the trial court did not abuse its discretion in granting the State's challenge for cause as to Mr. Lee.
The defendant sought to challenge for cause veniremen Silas Walker, Willie Young, Sr., Roderick Blouin, Christopher Cusimano, Leroy Boudreaux and Bruce Foy. Defendant argues that these prospective jurors stated that they could not consider life imprisonment as a possible punishment during the penalty phase. However, a review of the voir dire indicates that the State successfully rehabilitated each juror. These prospective jurors stated that they could consider mitigating factors to determine if life imprisonment should be imposed. Therefore, the trial court did not abuse its discretion in denying the defendant's challenges for cause as to these veniremen.
These assignments are without merit.

Assignment of Error No. 46
In this assignment, the defendant contends that the trial court erred in overruling defendant's objection and permitting the State to elicit hearsay testimony on direct examination of Detective Norman McCord relating to the contents of anonymous tip. The testimony of which the defendant complains occurred as followed:
BY THE PROSECUTOR:
Now what was the first big break that you got in this case?
BY DETECTIVE MCCORD:
From another anonymous call that stated that there were several individuals in the car with the perpetrator, Mr. Hawkins.
Hearsay is defined as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La.Code Evid.Ann. art. 801(C) (West). Law enforcement officers may not testify as to the contents of an informant's tip because such testimony violates the accused's constitutional right to confront and cross-examine his accusers. State v. Hearold, 603 So.2d 731, 737 (La.1992). Moreover, as to any exception to the hearsay rule based on an officer's testimony regarding information which immediately prompted an investigation, the issue of relevancy is significantly interrelated with the hearsay issue. *1080 See State v. Wille, 559 So.2d 1321, 1331 (La.1990). The fact that an officer acted on information obtained from an informant may be relevant to explain his conduct, but may not be used as a passkey to bring before the jury the substance of the out-of-court information that would otherwise be barred by the hearsay rule. Hearold, 603 So.2d at 737.
Generally, an explanation of the officer's actions should never be an acceptable basis upon which to admit an out-of-court declaration when the so-called "explanation" involves a direct assertion of criminal activity against the accused. Absent some unique circumstances in which the explanation of purpose is probative evidence of a contested fact, such hearsay evidence should not be admitted under an "explanation" exception. The probative value of the mere fact that an out-of-court declaration was made is generally outweighed greatly by the likelihood that the jury will consider the statement for the truth of the matter asserted. Id., at 737-38.
However, the introduction of statements complained of as hearsay which are merely corroborative and cumulative of other testimony presented by the state is harmless error. State v. Hall, 624 So.2d 927, 930 (La.App. 2 Cir.1993), writ denied, 629 So.2d 1182 (La.1993); State v. Franklin, 520 So.2d 1047, 1053 (La.App. 3rd Cir.1987).
In the case at bar, the statement was introduced to explain the officer's steps in the course of his investigation of the murder. However, the statement directly implicates the defendant as the murderer. Thus, under a strict construction of Hearold, the statement should not be allowed to fit under the explanation exception to the hearsay rule. However, the trial court's error in denying the defendant's objection to such testimony is harmless. Detective McCord testified after the Carter sisters who, by their testimony, admitted their presence in the defendant's vehicle at the time of the crime and implicated the defendant as the perpetrator of the murder. Thus, the officer's testimony was corroborative and cumulative to other testimony of the defendant's guilt presented by the state.
Accordingly, this assignment of error is without merit.

Assignments of Error Nos. 30, 33, 35-42, 47-50, 52-55
The defendant argues in these assignments of error that the trial court erroneously curtailed his constitutional right of cross-examination. The defendant suggests that the trial court limited his right of cross-examination of several of the State's witnesses. Defendant contends he should have been allowed to question Officer Gregory Migaud about Officer Treadway's statements on the taking of fingerprints. Migaud testified he did not believe that fingerprints could be taken from the victim's wallet. Officer Treadway had indicated that such was possible.
The defendant also sought to question Charmaine Carter on her testimony that the defendant struck the victim in the face prior to shooting him. The coroner's report did not indicate that the victim had bruises on his face. Defendant also questioned Charmaine Carter on her arrest for possession of cocaine prior to the present trial.
The state objected when the defendant sought to question Germaine Carter concerning an alleged inconsistency of her trial testimony with a statement given to defense counsel two days prior to trial. According to the statement given to defense counsel, the defendant had the victim's wallet and briefcase when the defendant returned to the Carters' residence. The defendant also sought to question the witness about her arrest for battery of a police officer and the reason why the charges were dropped.
The defendant argues that his cross-examination of Karen Carter was also limited. The trial court did not allow the defendant to question Karen Carter on how there could be a difference in the length of the moustache in the composite sketch made by Donnels and the defendant's moustache as shown in his mugshot. The defendant contends that the trial court limited his questioning of Karen Carter as to the issue of the victim's wallet and other alleged inconsistencies in her sisters' testimony and statements given to defense counsel two days prior to trial.
*1081 Defendant states that the trial court severely limited his cross-examination of Detective McCord. The defendant contends the trial court would not allow him to question the witness concerning the rap sheets and criminal histories of the two other suspects, Roy Mason and Renaud Courtney. The defendant also sought to question the detective on whether the defendant could have taken the victim's wallet to the Carters' residence. Defendant attempted to have the witness testify as to the Carter sisters' veracity and credibility. He also sought to elicit from the detective that the Carter sisters were eligible to obtain the reward money from Crimestoppers and Tulane University. The witness was also asked if he thought fingerprints could be taken from the victim's wallet, and if he regularly received false tips in homicide cases.
The right to cross-examination is guaranteed by both the federal and state constitutions. Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). The three main functions of cross-examination are (1) to shed light on the credibility of the direct testimony; (2) to bring out additional facts related to those elicited on direct; and (3) to bring out additional facts which tend to elucidate any issue in the case. State ex rel. Nicholas v. State, 520 So.2d 377, 380 (La. 1988).
La.Code Evid.Ann. art. 611 (West 1995 Special Pamphlet) provides in pertinent part:
A. Control by court. Except as provided by this Article and Code of Criminal Procedure article 773, the parties to a proceeding have the primary responsibility of presenting the evidence and examining the witnesses. The court, however, shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to:
(1) Make the interrogation and presentation effective for the ascertainment of the truth;
(2) Avoid the needless consumption of time; and
(3) Protect witnesses from harassment and undue embarrassment.
B. Scope of cross-examination. A witness may be cross-examined on any matter relevant to any issue in the case, including credibility ...
Under this article, a trial court has discretion to control the extent of the examination of witnesses. Nicholas, 520 So.2d at 381.
A review of the instances cited by the defendant reveals that the trial court did not abuse its discretion in sustaining the state's objections to the questions and/or comments of defense counsel. In regards to the question and comments posed to Officer Migaud, the trial court was simply protecting the officer from undue harassment.
MR. KOHNKE:
Q. And in your experience and your expertise, it's your statement to this jury that this type of rough and course surface is never suitable for prints?
A. Well in a technical sense, yes.
Q. Officer Treadway and I don't agree with you.
MR. WILLIAMS:
Judge, I object to that.
THE COURT:
Sustained, Mr. Kohnke.
MR. KOHNKE:
Officer Treadway testified sir, that
MR. WILLIAMS:
Objection.
THE COURT:
Sustained, Mr. Kohnke. The jury has heard the officer's testimony. This witness is not going to comment on his testimony. Get on to something else.
Officer Migaud had not heard Officer Treadway's testimony and therefore could not comment upon it. La.Code Evid.Ann. art. 602 (West 1995 Special Pamphlet) mandates that witnesses testify only as to those matters within their personal knowledge. As the court noted, the jury heard Officer Treadway's testimony concerning the ability to lift fingerprints from the victim's wallet. They were able to weigh the evidence and determine whom to believe on this *1082 issue. The trial court did not abuse its discretion in sustaining the state's objection to this line of questioning by defense counsel.
Defense counsel attempted a similar form of questioning with Charmaine Carter. Charmaine Carter testified that the defendant struck the victim in the face prior to shooting him. Defense counsel posed the following question to Charmaine on cross-examination: "You know of any reason why the coroner's reports and all the photographs don't show any evidence of that?" Clearly, the question sought information beyond the witness's own personal knowledge and was merely a way of letting the jury know that the witness's testimony conflicted with the autopsy report. The trial court did not abuse it's discretion in sustaining the state's objection to the question. Furthermore, the jury had heard the coroner testify concerning the victim's injuries and had viewed the photographs. The jury had sufficient information to assess the witness' credibility in light of the autopsy protocol and photographs.
Defense counsel also sought to question Charmaine Carter on her arrest for possession of cocaine prior to the present trial. The trial court refused to allow defense counsel to impeach the witness with only evidence of arrests. La.Code Evid.Ann. art. 609.1 (West 1995 Special Pamphlet) allows parties in criminal cases to impeach witnesses concerning any prior convictions. As the witness had not been convicted, the trial court correctly sustained the state's objection. Defense counsel later argued, out of the presence of the jury, that he sought to present evidence of the arrest to determine whether the witness had made a deal with the police. The trial court informed defense counsel that he would be permitted to question the witness about a "deal." However, defense counsel did not return to this issue with the witness.
Defense counsel attempted to question Germaine Carter on whether she told defense counsel two days prior to trial that the defendant brought the victim's briefcase to her house. Germaine Carter stated that she did not recall making such a statement. Defense counsel then stated:
Q. You don't recall telling me that he brought a brief case too?
A. No, I don't.
Q. If my notes have that you said he brought a brief case, would my notes be wrong?
A. I don't know.
Q. And if Bob Smith comes into this court and says
MR. WILLIAMS:
Judge, she can't answer that question. I object.
THE COURT:
Sustained.
BY MR. KOHNKE:
Q. and he told you that the wallet he had was the wallet that he got from this man?
A. No, he didn't.
Q. If he didn't, yet my notes reflect that, that too is wrong?
MR. WILLIAMS:
Objection. She can't answer that, what his notes say.
THE COURT:
Sustained, Mr. Kohnke.
Clearly, the trial court was correct in sustaining the state's objections. The witness could not possibly testify as to the content of the notes taken by defense counsel. Nor could she know what Bob Smith might say on direct examination. Such information was beyond her personal knowledge.
Defense counsel also questioned the witness on her and her sister's recent arrest and the fact that the charges were dropped. Germaine Carter acknowledged that she and her sister were arrested prior to trial on unrelated charges and that the charges were refused. When asked if she knew why the charges were refused, the witness responded in the negative. Defense counsel then made the following comment to which the state objected: "Just a coincidence, huh?". The trial court sustained the state's objection and ordered the jury to disregard the remark. The statement by defense counsel was not a question and simply a comment on the witness's negative answer. The trial court correctly sustained the objection. *1083 There was no limitation on defendant's cross-examination of Germaine Carter.
During his cross-examination of Karen Carter, defense counsel asked the witness to compare the composite sketch made by Johnny Donnels and the defendant's mugshot.
Q. I'd like to show you what has been marked as state's exhibit 14; is this the way Jonathan Hawkins looked the day or night that this shooting took place?
A. Not exactly.
Q. Is this a thin mustache?
A. Yes.
Q. That's a kind of thick mustache he had the night of the shooting.
A. Yes.
Q. If I were to tell you, ma'am, if I were to tell you this picture of Jonathan Hawkins was taken two weeks after this murder, how would describe that mustache?
A. (No response)
Q. That's a thick one, isn't it?
A. Hair doesn't grow that fast in no two weeks, does it?
MR. WILLIAMS:
She can't answer that. Objection.
THE COURT:
Sustained.
Defendant argues that the trial court erred in sustaining the State's objection and limited his cross-examination of the witness on this issue. Clearly, there was no error on the part of the trial judge. The question posed to the witness was speculative and beyond her own personal knowledge. Defense counsel was simply trying to use the witness to show the jury the alleged difference in the composite sketch and the defendant's mug shot.
Defense counsel also questioned Karen Carter on the alleged inconsistencies in her sisters' testimony. The trial court correctly sustained the state's objections. Again, the defendant was questioning the witness on matters which were beyond her own personal knowledge.
Defendant also contends that the trial court severely limited his cross-examination of Detective McCord. Defendant sought to introduce, through Detective McCord, information on the two prior suspects. Specifically, defense counsel questioned the officer on the contents of the rap sheets of Roy Mason and Renaud Courtney. Defense counsel also asked the officer if Mason was a "career criminal" and "violent person." The trial court correctly sustained the state's objections as the contents of the rap sheets constituted hearsay. Further, the information contained in the rap sheets was not relevant as the eyewitnesses to the murder were not able to identify either Roy Mason or Renaud Courtney as the perpetrator.
Defense counsel also questioned Detective McCord on the items taken from the victim. Detective McCord stated that the victim's wallet and watch had been stolen. Other testimony in the state's case revealed that the victim's wallet was found the day after the murder on Burdette Street. Louis Otto and his son saw the perpetrator throw the wallet in the bushes on Burdette Street. With this evidence introduced, defense counsel then asked the officer "Now, if someone had said that that [sic] wallet that was taken from that man appeared at the Carter's house with him, that's an impossible." The State objected on the basis that the question was speculative. The trial court sustained the objection. Again, defense counsel was asking a witness to testify beyond his own knowledge. Defense counsel was attempting to use Detective McCord to bring out an alleged inconsistency in the statements defense counsel took from the Carter sisters. The trial court did not err in sustaining the state's objection.
Defense counsel also sought to question Detective McCord on whether he agreed with Officer Treadway's testimony that the fingerprints could have been taken from the wallet. The trial court sustained the State's objection to the line of questioning. However, defense counsel was able to get Detective McCord to testify that he did not believe fingerprints would have been retrievable from the outside surface of the wallet.
*1084 Defendant claims that the trial court would not allow him to question Detective McCord on whether the Carter sisters were eligible for the Crimestoppers reward. However, a review of the transcript reveals that defense counsel simply made the statement "Who's to say the Carters won't be the first in line if he's" The trial court correctly sustained the State's objection and ordered defense counsel to save his "argument for the proper time."
Next, the defendant complains that the trial court limited his questioning of Detective McCord on whether the Carter sisters were able to get their information on the crime from the Times-Picayune article on the murder. Detective McCord stated that he did not know as he did not read the newspaper article. Defense counsel then made the statement "That's what made them so credible. They were able to give you information and then bring you to the location; is that right?" The trial court sustained the State's objection and again admonished defense counsel to save his argument. Clearly, the statement was a comment on counsel prior questioning of the witness. The trial court did not err in sustaining the objection.
The trial court also did not err in sustaining the state's objection when defense counsel attempted to question the officer on the possibility of people making false claims and giving false testimony. Defense counsel attempted to question the officer on the "Southern University" case. Such testimony was clearly not relevant to the case at bar.
Accordingly, for the foregoing reasons, these assignments are without merit.

Assignments of Error Nos. 34, 43, 44, 45, 58, 59, 63, 64
In these assignments, the defendant suggests that the trial court erroneously allowed the State to attack the credibility and integrity of its witnesses, namely its two investigators Gary Elldredge and Bob Smith. Defendant relied upon Gary Elldredge and Bob Smith to attack the credibility of the Carter sisters. Defendant argues that the trial court allowed the state to exceed the bounds of cross-examination and impeachment in questioning the two men.
La.Code Evid.Ann. art. 607 (West Special Pamphlet 1995) provides guidance on the issue of attacking a witness' credibility:
A. Who may attack credibility. The credibility of a witness may be attacked by any party, including the party calling him.
B. Time for attacking and supporting credibility. The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked. However, a party may question any witness as to his relationship to the parties, interest in the lawsuit, or capacity to perceive or to recollect.
C. Attacking credibility intrinsically. Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness' bias, corruption, or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
Elldredge, an investigator appointed to assist defense counsel, allegedly took statements from the Carter sisters. Elldredge wrote the statements and each woman initialled her own statement. Elldredge was allowed to testify as to the contents of the statements given by the Carter sisters. The statements taken by Elldredge were inconsistent with the statements the women gave to the police. Thus, the state, in order *1085 to reduce the effect of the statements given to Elldredge, tried to show that the statements were defective. The State's questioning of Elldredge was proper cross-examination in attempting to show that the written statements did not accurately reflect the information the Carter sisters gave to Elldredge. In addition, the sisters testified that Elldredge and his associate represented themselves as working with the District Attorney's office. In contravention of the women's assertions, Elldredge denied any such representations and stated that he sent the women "thank you" letters for the assistance they provided to himself and Ms. Berrigan. The State was within the proper scope of cross-examination to question Elldredge on the procedures he used to take the statements, including whether he represented to the women that he was working for the District Attorney's office. The trial court did not err in denying defense counsel's objections to the questions posed by the state.
Bob Smith testified in the defendant's case in chief. Smith had been hired by defense counsel a few days before trial to assist him in interviewing the Carter sisters. Smith and defense counsel spoke with Karen and Germaine Carter two days prior to trial. Through Smith, the defendant introduced evidence of the statements made to defense counsel. These statements were also inconsistent with the statements given to the police and the women's trial testimony. However, in this instance, the women were not asked to sign or initial the statements taken by defense counsel. During its cross-examination of Smith, the state questioned the witness on his ability to recall the information received from the women, in particular the route taken by the defendant prior to the murder. Such questioning was clearly within the scope of cross-examination and impeachment.
These assignments are without merit.

Assignments of Error Nos. 61, 62, 63, 64
By these assignments, the defendant argues the trial court erred in not allowing the jury to view certain defense exhibits. The trial court allowed the defendant to introduce certain documents into the record but would not allow the jury to view the documents. The documents which the defendant desired for the jury to view include the crime lab technician's report, the Crimestoppers' report naming a Dwight Payton as a possible suspect, the statements taken from the Carter sisters by Gary Elldredge, and Elldredge's "thank-you" notes to the Carter sisters.
In regards to the Crimestoppers report and Elldredge's "thank you" letters, a review of the record reveals that defendant did not object to the trial court's ruling that the documents would not be shown to the jury. As there were no contemporaneous objections to these rulings, these assignments are precluded from appellate review. La.Code Crim.Proc.Ann. art. 841 (West Supp.1995).
The trial court did not abuse its discretion in choosing not to submit the crime lab technician report and the statements taken from the Carter sisters to the jury. Officer Treadway, the crime lab technician, testified extensively on the crime scene and the evidence found. The officer's testimony was the best evidence of his findings at the crime scene. In addition, photographs of the crime scene were shown to the jury.
Gary Elldredge's testimony as to the statements he took from the Carter sisters was also the best evidence of the sisters' statements. Elldredge was allowed to testify as the contents of each statement taken. Defense counsel brought out the inconsistencies between the statements taken by Elldredge and the statements given to the police. Further, it should be noted that the women did not write the statements themselves. Elldredge wrote the statements as he questioned the women. Thus, Elldredge's testimony as to what he had written was the best evidence. The trial court did not abuse its discretion in not allowing the jury to view the written statements.
These assignments of error are without merit.

Assignment of Error No. 66
The defendant further contends that the evidence was insufficient for the jury to find *1086 the defendant guilty of first degree murder beyond a reasonable doubt.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817, 820 (La.1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372, 378 (La. 1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La.Rev.Stat.Ann. 15:438 (West 1992). La.Rev.Stat. 15:438 is not a separate test from Jackson v. Virginia, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198, 1201 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d at 820.
La.Rev.Stat.Ann. 14:30(A)(1) (West Supp.1995) defines first degree murder as "the killing of a human being: [w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of... armed robbery." The testimony of the Carter sisters reveals that the defendant had the intent to kill and/or inflict great bodily harm on the victim and that the defendant was engaged in the perpetration of an armed robbery when he killed the victim. The women testified that they were in the vehicle when the defendant shot the victim. They saw the defendant approach the victim, strike the victim in the face and then shoot the victim. The defendant told them that he shot the victim because the victim "wouldn't give it up." The testimony of Louis Otto and his son corroborate that the perpetrator had taken the victim's wallet. Thus, there was sufficient evidence for the jury to find, beyond a reasonable doubt, that the defendant was guilty of first degree murder.
This assignment is without merit.

Assignments of Error Nos. 67 and 68
The defendant argues that the appellate record is still too incomplete to provide the defendant with an adequate appellate review of his conviction. The defendant argues that the lack of the transcripts of opening statements, closing arguments and jury instructions prevent a complete and adequate appellate review, and thus, a reversal of the defendant's conviction is mandated.
The state constitution provides that "[n]o person shall be subjected to imprisonment... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based." La. Const. Art. I, § 19. (West 1977). In felony cases, the recording of "all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel" is statutorily required. La.Code Crim.Proc.Ann. art. 843 (West 1984). This court has recognized that a complete appellate review of a defendant's conviction and sentence can be accomplished even when there are missing portions of the trial record. In State v. Thomas, 637 So.2d 1272, 1274 (La.App. 4th Cir.1994), writ denied, 94-1725 (La. 11/18/94) 646 So.2d 376, cert. denied, Thomas v. Louisiana, ___ U.S. ___, 115 S.Ct. 1437, 131 L.Ed.2d 317 (1995), this court held that the record was adequate for full appellate review. Missing from the trial record were transcripts of the voir dire, jury instructions, opening and closing arguments. The court noted that "[b]ecause the missing portions of the trial record are not evidentiary, their absence does not compromise the defendants' right to a judicial review of all evidence." Thomas, at 1274. In addition, the minute entries of the trial did not indicate that the defendant made any objections during the proceedings missing from the record.
*1087 Also, in State v. Lyons, 597 So.2d 593, 597-99 (La.App. 4th Cir.1992), this court concluded that the appellate record was adequate for review although transcripts of the voir dire, the impaneling of the jurors, opening statements, and a portion of the jury charges were missing. The court noted that the defendant had made no specific assignments of error as to the missing portions of the record except the fact that they were missing.
The case at bar is akin to Thomas and Lyons. The minute entries of the trial in the present case indicate that the defendant did not make any objections during the jury instructions, opening statements and closing arguments. Thus, as in Thomas, since the missing portions of the record are not evidentiary, "their absence does not compromise the defendant['s] right to a judicial review of all evidence." The record in the case before this court is adequate for full appellate review of the defendant's conviction.
These assignments of error are without merit.

Assignments of Error Nos. 69 and 70
In his last two assignments of error, the defendant contends that the trial court erred in failing to give defendant's proposed instructions. The record discloses that the defendant sought to have the trial court give a preliminary instruction on the death penalty. The trial court gave part of the instruction requested but not the entire instruction. The minute entry from the first day of trial recognized that the defendant filed the preliminary instruction. However, there is nothing in the record or minute entry to suggest that the defendant objected to the trial court's decision to give part of the requested instruction. Accordingly, without an objection, this assignment is not reviewable on appeal. La.Code Crim.Proc.Ann. art. 841 (West 1984). Furthermore, this issue is moot as the death penalty was not imposed. The defendant was sentenced to life imprisonment at hard labor.
The defendant also sought to have the trial court give a special jury instruction on the right of the defendant to remain silent. The minute entry indicates that there were no objections to the jury instructions as given. Thus, the alleged denial of the trial court to give the special jury instruction on the defendant's right to remain silent is not subject to review as the failure to object precludes appellate review of the issue. Id.
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Defendant's assignment of error number 20 should be considered as abandoned since defendant failed to brief or discuss this assignment in his appellate brief. State v. Bray, 548 So.2d 350 (La.App. 4th Cir.1989). In this assignment of error, the defendant alleged that the trial court erred in allowing the state to refer to other cases during voir dire examination of prospective jurors while prohibiting defense counsel from doing likewise.