761 So.2d 115 (2000)
STATE of Louisiana
v.
James Thomas PORTER, Jr.
No. 99-1722.
Court of Appeal of Louisiana, Third Circuit.
May 3, 2000.
*117 Rick Bryant, District Attorney, F. Wayne Frey, Donald Guidry, Paul Reggie, Assistant District Attorneys, Lake Charles, Counsel for Appellee/State of Louisiana.
Lawrence C. Billeaud, Louisiana Appellate Project, Lafayette, Counsel for Appellant/Arthur James, Jr.
(Court composed of NED E. DOUCET, Jr., Chief Judge, SYLVIA R. COOKS, and OSWALD A. DECUIR, Judges).
DOUCET, Chief Judge.
This appeal seeks the review of the conviction and sentence of James Thomas Porter, Jr. for the second degree murder of three-year-old Morgan Bonton. The grand jury of Calcasieu Parish originally indicted the Defendant for the first degree murder of the victim. On June 1, 1999, at the conclusion of the guilt phase of the trial, the jury returned a verdict of guilty of second degree murder. Thereafter, on September 1, 1999, the trial judge imposed the statutorily mandated sentence of life imprisonment without benefit of probation, parole or suspension of sentence.
The Defendant appeals his conviction by raising one assignment of errorthe alleged insufficiency of the evidence.

FACTS:
At approximately 10:25 a.m. on Monday, April 20, 1998, Dion Brown, the admitting clerk for the Emergency Room at Lake Charles Memorial Hospital, saw Dusty Bonton come into the Emergency Room (ER) carrying her daughter, three-year-old Morgan Bonton, wrapped in a bathrobe. The mother told the staff that Morgan had fallen while taking a bath, but neither Ms. Brown nor the triage nurse, Marla Goodeaux detected any dampness on the bathrobe or Morgan's body. Nurse Goodeaux took note of the lack of any dampness because if Morgan had been hurt while bathing, it could have affected her treatment.
Upon arrival at the ER, Morgan had no detectable pulse or respiration, her body was cold and limp, and her skin was pale and mottled. The three-year-old had no blood pressure and her body temperature was so cold when she arrived that it could not be recorded. Nurse Goodeaux immediately took the lifeless Morgan Bonton into the Trauma Room.
The ER staff administered CPR, put warm blankets on her to raise her body temperature, and started I.V. fluids to help establish a blood pressure. The staff successfully resuscitated the young child. Eventually Morgan's temperature registered at 88.9° at 12:20 p.m. when she was moved to the Intensive Care Unit. At that time she also had an acceptable pulse and blood pressure.
Nurse Goodeaux testified that she noticed fluid draining from Morgan's nose and ears. This fluid tested positive for the presence of glucose, indicative of cerebral spinal fluid and of a possible head injury. The ER staff physician contacted Dr. Juan Bossano, a neonatologist, to consult on the treatment of the child. Dr. Bossano found Morgan to be in a "profound coma" by the time he arrived at the Emergency Room. She had been resuscitated within eighteen minutes of her arrival in the ER, but even with a palpable pulse, she did not register any blood pressure until thirty minutes after her arrival. The reports generated by the medical staff used the term "asystole," which means that Morgan's heart was not pumping blood.
In addition to the aforementioned serious conditions, the ER personnel also noticed that Morgan had bruises, swelling surrounding her left eye, burns and skin lesions on her torso and buttocksall indications of physical child abuse. Concerning *118 the bruises, burns, and lesions on Morgan's body, Dr. Bossano testified that they were in different stages of healing. Dr. Bossano noticed that the burns on Morgan's right chest were in the shape of a household iron. Hospital representatives immediately contacted the police about the suspected child abuse.
Dr. Bossano explained the three degrees/stages of a coma. In the first stage, the patient will usually respond to sound. Then, as the patient slips into a deeper coma, the patient loses the ability to respond to sound, but can still respond to touch or tactile stimuli. Finally, when the patient slips into a deep coma, the only response is to deep pain. Upon admission to the ER, Morgan had some weak withdrawal response to deep pain in one arm and no effective respiration, just occasional gasping. Dr. Bossano also noted that Morgan was never able to breathe unassisted; she had to breathe through an endotracheal tube attached to a ventilator.
While in the Emergency Room, a CT scan of Morgan's head was ordered. Dr. Gene Lampson, a radiologist, explained that the CT scan was a series of x-rays of the child's brain. The first CT scan was taken shortly after Morgan was brought to the ER, and Dr. Lampson examined it and found it appeared to be normal. The next day, a second CT scan was taken and Dr. Donald Thomas, a radiologist and partner of Dr. Lampson, reported diffuse swelling of the brain with hemorrhaging in and around the brain. When Dr. Lampson later compared the first and second CT scans, he said he could see subtle signs of changes in Morgan's brain. Both Drs. Lampson and Thomas noted that after trauma, it takes time for the brain to manifest an injury with swelling. Dr. Thomas said the swelling in Morgan's brain could have resulted from trauma to her head or from the cardiac arrest she suffered at the time she was brought into the ER. Both radiologists agreed that Morgan could have suffered a trauma or blow to her head on Sunday or early Monday, and it would not have manifested itself on the CT scan taken Monday at approximately 11:00 a.m.
Dr. Slaman Salibi, a neurologist who examined Morgan on Monday, April 20, 1998, found her non-responsive except to deep pain stimulation in one arm. Later, Morgan lost even that response. On Tuesday, April 21, 1998, Dr. Salibi ordered an EEG performed to measure any electrical activity in Morgan's brain. The EEG showed no measurable electrical activity in the brain; in other words, by Tuesday, April 21, 1998, Morgan Bonton was brain dead.
Dr. Bossano met with Dr. Salibi, who had studied the CT scans and medical reports of the radiologists; he also met with Morgan's family between noon and 1:00 p.m to discuss Morgan's condition. Thereafter, at 2:30 p.m. on Tuesday, April 21, 1998, Morgan Bonton was removed from life support. She died five minutes later.
James "Ernest" Booker, a friend and coworker of the Defendant and Dusty Bonton, testified that the Defendant had been with him at his apartment on Sunday, April 19, 1998, from 2:00 p.m. to approximately 4:30 p.m. He also stated that the next morning, when Dusty Bonton came to his apartment at approximately 9:30 a.m. or 10:00 a.m., she appeared to be her usual self. Shortly after she arrived, the Defendant called and left a message on Mr. Booker's answering machine requesting him to pick up the phone for an urgent message. When she heard the Defendant's frantic voice, Dusty left immediately. Mr. Booker dressed and met the couple as they were pulling out of their driveway on the way to the hospital. The Defendant told Mr. Booker that the baby was hurt. As Mr. Booker pulled up to the ER of the hospital, he saw the Defendant leaving. The Defendant told Mr. Booker he was going home. Mr. Booker stated: "I asked him why? He said he just had to go, and he took off. And I followed him to his house."
*119 When Mr. Booker got to the Defendant's home, the Defendant was pacing back and forth, frantic and "kind of hysterical," basically telling Mr. Booker that he was giving Morgan a bath when she defecated in the tub; and as the Defendant was going to spank her, she pulled away, slipped in the tub and hit her head on the faucet. The Defendant stated that he asked Morgan if she was okay, she told him yes, but then she passed out. The Defendant said the child stopped breathing, he tried to give the child mouth to mouth resuscitation, and when that did not work, he ran down the street to use a pay phone to call Mr. Booker. The Defendant then told Mr. Booker "it was an accident and nobody was going to believe him."
Mr. Booker recalled that when he babysat Morgan a week before this incident, he noticed an open sore on her right buttock. The sore had a scab on it that was a little larger than a half dollar coin. Mr. Booker was concerned about the injury and asked the Defendant about it. The Defendant said he did not know how Morgan got the sore and Dusty had not told him. Mr. Booker suggested that the Defendant put an antibiotic cream on the sore to help it heal. At the time, it did not cross Mr. Booker's mind that the sore may have been the result of child abuse.
As noted, the Defendant dropped off the mother, Dusty Bonton, and Morgan at the Emergency Room and then he immediately left to return home. Later, the Defendant returned to the hospital. By that time the police had arrived to investigate the suspected child abuse. Officer Charles Brown testified that he was standing with the Defendant outside the ER doors while the Defendant smoked a cigarette, when the Defendant asked him why he was there. Officer Brown told the Defendant he was there to find out what happened, and the Defendant responded, "I know I'm in trouble but I didn't mean it." The Defendant then recounted to the officer the same scenario he had told Mr. Booker that the victim had fallen in the bath tub while trying to avoid being spanked by the Defendant.
Corporal Lesia McCullough accompanied the Defendant to the security office of the hospital to await the arrival of the detectives. While sitting there, the Defendant began to talk about the incident. Corporal McCullough informed the Defendant she could not discuss anything with him but the Defendant continued to talk. He asked "can you tell I'm lying, I didn't mean to hurt her." Shortly thereafter, Corporal McCullough turned over the Defendant to the detectives with the Violent Crimes Task Force.
Detective Ramby Cormier was the lead investigator of this crime. He testified that the Defendant signed a waiver of rights form at the hospital and made a brief statement. The Defendant agreed to go with the detective to the office of the Violent Crimes Task Force to give a more detailed statement. Thereafter, the Defendant gave two videotaped statements at the Violent Crimes Task Force office. The Defendant's first statement lasted from 1:42 p.m. until 3:22 p.m. The Defendant then left the detective's office. At approximately 7:14 p.m., the Defendant had his friend drive him back to the Violent Crimes Task Force office where he agreed to continue talking with the police. The police informed the Defendant that Dusty Bonton had given a statement which was somewhat inconsistent with the Defendant's first statement. The Defendant was also informed that the doctors had said that some of the victim's injuries were more extensive and others were more recent than the Defendant had recounted. The second interview began at 7:14 p.m. and ended at 8:11 p.m., when the Defendant asked for a lawyer. Both videotaped statements were played to the jury. The trial judge gave the jury an instruction not to consider that the Defendant had requested a lawyer.
Throughout both statements, the Defendant was cooperative. The Defendant claimed that the victim fell in the bathtub *120 and hit her head on the faucet five minutes before she lost consciousness. He admitted he spanked the victim with a wooden paddle, and such spankings caused bruises on the victim's buttocks and these bruises formed bleeding scabs. Later, the Defendant said he used switches, spatulas, the flat back to a hairbrush and a ruler as paddles to spank the three-year-old victim. The Defendant and Dusty Bonton did not take the victim to a doctor or hospital for the injuries she sustained before her fatal injuries for fear that the victim would be taken from Dusty's custody.
The Defendant admitted the victim had burns on her chest and back from a household iron. The Defendant maintained the child was burned when she became entangled in the cord leading to the hot iron and ending up "wrestling" with the iron. He estimated that the incident took place some two and one-half weeks before April 20, 1998. However, the police informed the Defendant that the doctors said the burns were more recent. The police also told the Defendant that the victim's injuries were more extensive than those the Defendant recalled, and that the doctors said the wounds did not appear to be accidental. The police asked the Defendant not to give them "half-truths" and leave anything out. The Defendant was then reminded that Dusty had said things that were inconsistent with some of the Defendant's statements. At trial, on cross-examination, Detective Cormier admitted he misled the Defendant in part when he told the Defendant in the second videotaped statement that the doctors had asked the police to find out more information so they could properly treat Morgan. Shortly after the conclusion of the second videotaped statement, the Defendant was arrested for cruelty to a juvenile. Later, Dusty Bonton was charged with the same offense. When Morgan Bonton died, both Dusty Bonton and the Defendant were charged with her murder.
Dr. Terry Welke, the coroner, performed an autopsy on Morgan Bonton at 12:15 p.m. on Wednesday, April 22, 1998. Dr. Welke took numerous photographs of the victim's body showing the extent of her burns, bruises, and scars. Dr. Welke stated the burn patterns on the chest and back of Morgan were consistent with the flat surface, pointed shape and steam holes of a steam iron. On the chest of Morgan, the coroner found three distinct orientations of the iron. There was a bruise over the left eye that appeared to be two to three days, but not more than a week old. The coroner described this bruise on the left eye and a similar bruise over the right eye as blunt force injuries, which he opined were caused by a fist or possibly a hand.
On Morgan's back, the burn patterns were also consistent with those on her chest; that is, they were caused by a pointed flat surface with holes consistent with that of a steam iron. The coroner found two burn orientations on her back and one on her elbow. He also found other bruises on her back that left parallel lines of bruises.
On the buttocks, there were two areas of "proud flesh" or granulation tissue caused by loss of the upper layers of skin. These areas had been severely damaged to tear or burn away the top layers of skin. The cause of the injuries was hard to determine; there was signs of healing of these areas. The coroner could not tell how long it would have taken for the areas to heal because there had been an extensive amount of tissue loss. The coroner said the type of injury on the buttocks would have been extremely painful. He thought that multiple spankings with a paddle could have produced these injuries because it would take a tremendous amount of force to tear away the skin. From the scarring around the wounds, the coroner determined that the injuries to the buttocks were more than two to three weeks old. Below the scarring on the right buttock, there were two new injuries in the shape of parallel lines of bruising.
Other bruises were found on the back fold of the leg. One laceration to the lip of *121 the victim could have been caused while the Emergency Room staff was attempting to resuscitate Morgan. In addition to the laceration and bruising in the area above Morgan's left eye, the coroner noted that he found a blunt force injury to the back of Morgan's head. Examination of Morgan's skull and the surface of her brain revealed the bruising under the skin and that blood had accumulated on the surface of the brain from the blow to the back of Morgan's head. There was no bruising of Morgan's brain, itself, but there was bleeding on the surface of the brain and under the skin of the scalp.
Dr. Welke was able to superimpose the steam iron seized from the Defendant's home over the burn patterns on Morgan. The coroner further opined that these burn injuries were not accidental, but intentional because of the manner in which they were inflictedthe borders of the burns were sharp and the holes perfectly circumscribed. The coroner concluded that all of the burns occurred during some short time interval, at approximately two weeks prior to the autopsy, but not at the same time. Dr. Welke felt the burns would have all been extremely painful injuries.
Dr. Welke then took the hairbrush seized from the Defendant's home and showed how the raised parallel ridges on the back of the brush matched up with the injuries to Morgan's shoulder and legs that had parallel lines of bruises. Again, Dr. Welke felt these injuries were intentionally inflicted and not accidental. Dr. Welke noted that with the burns on her chest and the other injuries on her buttocks, it would have been very painful for Morgan to sleep.
The cause of death of Morgan Bonton was listed as blunt force injuries to her head. In the coroner's opinion, the laceration above Morgan's left eye caused the bruising in that particular area of her head, but one or more separate blows to the back of the head caused her death. The coroner felt the fatal injury was inflicted the day before Morgan went to the hospital. This was because Morgan's stomach still contained peas and corn that were intact and undigested. Dusty Bonton said Morgan ate peas and corn for supper Sunday. Normally, the stomach will digest and clear out food within two to three hours after eating. Since the body systems would have shut down when she slipped into a coma, the coroner determined from the history given, that the blow to the back of Morgan's head was inflicted around suppertime on Sunday. Dr. Welke further noted that for Morgan's body temperature to plunge 11~ to read at 88.9~ at noon on Monday, April 20, she would have had to have been essentially brain dead on Sunday evening. The coroner felt Morgan would have been unable to move any on her own on Monday morning.

ERRORS PATENT:
In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by the court for errors patent on the face of the record. After reviewing the record, we find there are four errors patent.
First, the trial court denied the Defendant's motion for new trial on the same day as sentencing. In accordance with La.Code Crim.P. art. 873, the trial court should have delayed sentencing for twenty-four hours. However, this error is harmless since the Defendant received a mandatory life sentence. State v. Williams, 617 So.2d 557 (La.App. 3 Cir.), writ denied, 623 So.2d 1331 (La.1993).
Second, the Defendant was not informed of the prescriptive period for filing post-conviction relief as is required by La. Code Crim.P. art. 930.8. Thus, the district court is directed to "inform the [D]efendant of the provisions of Article 930.8 [as amended by Act 1262 of the 1999 Regular Legislative Session] by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the [D]efendant received the notice in the record of the proceedings." State v. Fontenot, *122 616 So.2d 1353, 1359 (La.App. 3 Cir.), writ denied, 623 So.2d 1334 (La.1993).
Thirdly, we note the trial court neither specifically stated that the sentence of life imprisonment was to be served at hard labor, nor did the trial court specifically remand the Defendant to the Department of Corrections for service of his sentence. Since, however, the sentence for second degree murder is a mandatory sentence of life at hard labor, these omissions are also harmless.
Finally, we note an issue involving the sequestration of the jury. According to La.Code Crim.P. art. 791(B), "In capital cases, after each juror is sworn he shall be sequestered, unless the state and the defense have jointly moved that the jury not be sequestered." Before jury selection began, the trial court informed the parties that the jurors would not be sequestered until the entire panel, including the alternates, was completed. Defense counsel objected, and the court advised that the jurors would be sequestered as they were selected. Later, defense counsel withdrew her request that the jurors be sequestered at the time they were selected. According to the minutes, the trial court questioned the Defendant, and the Defendant agreed with "this request." The trial court then stated that the jurors would not be sequestered until the entire panel, including the alternates, was selected.
Subsequently, twelve jurors and four alternates were accepted and sworn. The trial court then released them Saturday, June 12, 1999, "with instructions to return on June 14, 1999, at 8:00 a.m., for sequestration." The minutes of June 14, 1999, indicate that the entire jury panel was sworn "in chief upon the trial of this case to-wit." The trial court ordered the Jury Sequestration Order filed into the record.
The trial court stated that the jurors would not be sequestered until all jurors, including the alternates were selected. According to the minutes, the selection of the twelve jurors and the alternates was completed on Saturday, June 12, 1999. However, they were not sequestered until they returned on June 14, 1999. Thus, it appears that the sequestration was delayed even beyond the implied agreement.
Although the delay in sequestration may not have been in accordance with the implicit agreement by the parties, we find any possible error was harmless. In State v. Hawkins, 90-1235 (La.App. 4 Cir. 9/15/95); 667 So.2d 1070, the fourth circuit addressed a similar issue. Although the transcript of jury selection indicated the prospective jurors were informed that they would be sequestered, nothing in the record actually indicated they were, in fact, sequestered. Finding any error would be harmless, the court stated:
The failure to sequester a jury is a statutory error. Except where the penalty of death has been imposed, it is not an error requiring automatic reversal. It is an error subject to the contemporaneous objection rule and one which, on appeal, must be evaluated in terms of fundamental fairness. Even if we accept as fact that the jury was not sequestered, we find that the error was harmless and did not impact the fundamental fairness of the proceedings.
Id. at 1076.
Although the supreme court did not discuss the error patent, the court affirmed Hawkins' conviction in State v. Hawkins, 96-0766 (La.1/14/97); 688 So.2d 473.
The record implies that the parties jointly agreed on the trial judge's plan to delay sequestration. No one objected at trial that the delay was longer than agreed upon. Further, no one has objected on appeal. Finally, inasmuch as the Defendant was convicted of second degree murder, he did not receive the death penalty. Even if the delayed sequestration was an error, there is neither any claim nor any indication that it affected the fundamental fairness of the proceedings.

*123 ASSIGNMENT OF ERROR NO. 1:

By his sole assignment of error, the Defendant claims that the State failed to prove that he inflicted the fatal blow to Morgan Bonton on Sunday, April 19, 1998. In other words, the Defendant contends that the State did not exclude the reasonable hypothesis that another person, namely Dusty Bonton, Morgan's mother, inflicted the fatal blow to Morgan's head. In the jury instructions given at the trial, the trial judge instructed the jury on the law concerning principals to a crime. "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La.R.S. 14:24. Thus, the jury could have convicted the Defendant of the murder of Morgan Bonton even if they believed that he did not personally inflict the fatal injury.
The trial judge also instructed the jury on the definition of second degree murder contained in La.R.S. 14:30.1(A)(2)(b), because this was one of the lesser responsive verdicts to the original first degree murder charge. In 1997, the Louisiana legislature amended La.R.S. 14:30.1(A), the definition of second degree murder, to include:
(2)(b) When the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm.
We find no reported cases discussing second degree murder convictions pursuant to La.R.S. 14:30.1(A)(2)(b). In order to convict a defendant of second degree murder pursuant to this section, the State must prove that the death of three-year-old Morgan Bonton occurred while the Defendant was engaged in the perpetration of cruelty to juveniles.
Cruelty to juveniles is set forth in La.R.S. 14:93(A), and it provides that cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect of a child whereby unjustifiable pain or suffering is caused to the child. The term "intentional" within the meaning of this statute, requires general criminal intent to cause a child unjustifiable pain and suffering. State v. Cortez, 96-859 (La. App. 3 Cir. 12/18/96); 687 So.2d 515, 519, citing State v. Morrison, 582 So.2d 295 (La.App. 1 Cir.1991). Mistreatment as used in this statute means "abuse." State v. Cortez, 687 So.2d at 519, citing State v. Comeaux, 319 So.2d 897, 899 (La.1975).
Thus, in order for the State to prove that the Defendant was guilty of the second degree murder of Morgan Bonton it had to establish either (1) that the Defendant intentionally mistreated or neglected the child, or (2) that the Defendant was criminally negligent in his mistreatment or neglect of the child. To be criminally negligent in his mistreatment or neglect of the child, the Defendant must have such disregard of the interest of the child that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. See La.R.S. 14:12.
Circumstantial evidence consists of the proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Guillory, 670 So.2d at 304, citing State v. Donahue, 572 So.2d 255 (La.App. 1 Cir. 1990). The circumstantial evidence rule does not require the State to exclude every possible theory of innocence, but only the reasonable hypotheses of innocence. State v. Lilly, 468 So.2d 1154 (La.1985). In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror *124 could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). State v. Davis, 92-1623 (La.5/23/94); 637 So.2d 1012, certiorari denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994).
In the present case, the State presented the testimony of the coroner that the victim, a three-year-old child, suffered extensive physical injuries that were extremely painful, and that these injuries had been inflicted upon the child within the two to three weeks prior to her death. The coroner explained why he concluded that most of the injuries he found on Morgan were intentionally inflicted and not accidental. The coroner linked the steam iron seized from the Defendant's residence to the burn wounds on the victim's chest, arm and back. The coroner also linked the hairbrush seized from the Defendant's home with bruises found on the victim's body explaining that the bruises had parallel lines matching the parallel ridges found on the back of the hairbrush. The purpose of presenting the evidence of the painful nature of the injuries and the fact that they were not accidental, but intentionally inflicted, was to negate any claim of accidental injury, to prove either the Defendant's specific intent for the purpose of the first degree murder charge or to prove cruelty to a juvenile which was an essential element of the responsive verdict of second degree murder.
Mr. James "Ernest" Booker testified that he saw the wound on the victim's right buttocks one week before her death. Mr. Booker stated he brought this wound to the Defendant's attention, and that the Defendant said he did not know how Morgan got the wound. The Defendant then asked Mr. Booker what could be done to help it heal.
When the victim was rushed to the hospital, the Defendant did not accompany her and her mother into the ER, but instead dropped the two off and returned home. At that time, the Defendant told Mr. Booker that no one would believe him that "it was an accident." The Defendant made similar statements when he returned to the hospital. In his videotaped statements to the police, the Defendant admitted he spanked Morgan but he denied abusing her. The Defendant also said he and Dusty were afraid to take Morgan to the doctor for her injuries for fear that Morgan would be removed from their custody. The Defendant's explanation of how Morgan hit her head while he was bathing her on Monday morning was refuted by the nature of her injuries and the fact that her undigested stomach contents and extremely low body temperature indicated that she had sustained serious head injuries and had slipped into a coma on Sunday evening shortly after she ate her supper.
The case of State v. Koon, 31,177 (La. App. 2 Cir. 2/24/99); 730 So.2d 503, in which the defendant was found guilty of second degree murder, is remarkably similar in its facts to the present case. However, the homicide in Koon arose before the amendment of La.R.S. 14:30.1(A)(2) to include an unintentional homicide occurring during the commission of cruelty to a juvenile. Thus, in Koon, the State had to refute an accidental fall and to prove the defendant had the specific intent to kill or inflict great bodily injury when he killed the child. In Koon, the child was brought to the hospital cold, pale and with no vital signs. Unlike the present case, the doctors in Koon did not attempt to resuscitate the victim, whom they determined had been dead for twenty to thirty minutes before the child arrived at the hospital. Among the facts established in Koon was that the type of head injury suffered by the child could not have resulted from a fall unless the child fell thirty to fifty feet; the child's head injury in Koon was a "crushing" head injury. The State in Koon established that the child had also suffered past physical child abuse consistent in time to when the defendant began to live with the child and his mother.
*125 In the present case, the jury returned the responsive verdict of second degree murder. Thus, to uphold the conviction, this court need not conclude that the State proved specific intent on the part of the Defendant to kill or inflict great bodily injury upon Morgan Bonton, but only that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. The State proved that Morgan was rendered unconscious close in time to when she ate her supper on Sunday, April 19, and that she slipped into a coma and vegetated throughout the night and next morning. The Defendant's explanations of what happened during the morning of Monday, April 20, were refuted by the expert testimony of the doctors who treated Morgan, and by the coroner's findings. The Defendant's actions after he literally dropped off Dusty and Morgan at the ER door, and his statements made to James "Ernest" Booker and the police at the hospital indicate that the Defendant was conscious of his guilt or at least he was aware that he was responsible for Morgan's injuries.
In order to convict the Defendant of second degree murder the State could either prove the Defendant actually caused the fatal injuries or that he was a principal to the crime under La.R.S. 14:24. The State had to prove either that Morgan died while the Defendant intentionally mistreated her by inflicting painful injuries upon her; or that Morgan died while the Defendant either intentionally refused to seek medical treatment for her injuries, or was criminally negligent in failing to seek medical treatment for her injuries; that is, the Defendant had such disregard for the interest of the child that his delay in seeking medical treatment for her amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.
Our review of the record convinces us that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime of second degree murder had been proved beyond a reasonable doubt. Jackson, 443 U.S. 307, 99 S.Ct. 2781; State v. Captville, 448 So.2d 676 (La.1984).
For the foregoing reasons, the Defendant's conviction and sentence are affirmed. The trial court is directed to inform the Defendant that pursuant to La. Code Crim.P. art. 930.8, he has two years from the date this judgment and sentence become final to apply for post-conviction relief. This notice shall be in writing and sent to the Defendant within ten days of the rendition of this opinion. Written proof that the Defendant received the notice shall be filed in the record of these proceedings.
CONVICTION AND SENTENCE AFFIRMED; CASE REMANDED WITH INSTRUCTIONS.