hEZELL, J.
On December 3, 1998, a Calcasieu Parish grand jury indicted Defendant, Randy McDonald, and four other men for aggravated rape and armed robbery, violations of La.R.S. 14:42 and 14:64, respectively. On September 13, 1999, the State amended the indictment to clarify that each co-defendant was charged with a single count of aggravated rape and that Defendant was not charged with armed robbery. Defendant stood trial on October 17, 2000, but the jury deadlocked, and the court declared a mistrial.
After further motions, a second jury trial began on April 1, 2002. On April 4, the jury found Defendant guilty as charged. On April 5, the court denied Defendant’s motion for post-verdict judgment of acquittal. Defendant stated he was ready to proceed, and the court sentenced him to the mandatory term of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
Defendant now appeals his conviction.
*130 FACTS
On September 28, 1998, S.V.[1] was ejected from a drug and alcohol treatment center in Lake Charles, Louisiana. She wanted to return to Opelousas, and a man named Michael Guillory offered to help her. The pair walked to the nearby home of Dewey Miller, a friend of Guillory’s, so that S.V. could use the telephone.
S.V. was unsuccessful in contacting anyone to give her a ride to Opelousas. Miller had to leave, so he asked S.V. and Guillory to leave, also. Upon leaving, the pair soon encountered Kristopher Schoening, a.k.a. Justin Schoening. The three smoked marijuana together, then proceeded to the nearby home of Defendant, Randy McDonald.
| ^Guillory and Schoening then left. Defendant began touching the victim, although she asked him not to do so. She then heard Forrest Bradford, a.k.a. “Red,” calling her into a back bedroom. Bradford offered to drive her back to Opelousas, in exchange for sex. She did not agree, but Bradford grabbed her, removed her clothing, put his penis in her mouth, then engaged in vaginal intercourse with her. After Bradford was finished, the Defendant had vaginal intercourse with S.V. At some point, Guillory and Schoening returned to the house, and they also had sex with her. Defendant also returned to the room and had anal sex with her. Michael Hoffpauir, who was also at the house, had sex with her. The victim did not consent to have sex with any of them.
At one point, the victim screamed and Schoening put a pillow over her head and pistol-whipped her. When the ordeal was over, S.V. got dressed[2] and returned to the treatment center, seeking help. Guil-lory followed her halfway back to the center, claiming he had a gun. However, she finished the trip by herself, running the rest of the way to the center. Once there, she convinced someone to call the police. The subsequent investigation led to the arrest of Defendant and the other men.[3]
ERRORS PATENT
The Court has reviewed the record in accordance with La.Code Crim.P. art 920 and finds that there are no errors patent.
Although the Defendant was sentenced immediately after the trial court’s denial of his motion for post verdict judgment of acquittal, and La.Code Crim.P. art. 873 mandates a twenty-four-hour delay between the denial of such motions and the | ..¡imposition of sentence, the Defendant indicated at sentencing that he was prepared to go forward with sentencing. The court finds that this would be harmless since the Defendant received a mandatory life sentence. State v. Porter, 99-1722 (La.App. 3 Cir. 5/3/00), 761 So.2d 115; State v. Williams, 617 So.2d 557 (La.App. 3 Cir.), writ denied, 623 So.2d 1331 (La. 1993).
ASSIGNMENT OF ERROR NO. 1
In this assignment, Defendant argues the evidence adduced at trial was insufficient to support his conviction. The test for such sufficiency challenges is well-settled:
In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is gov *131 erned by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard the appellate court must determine that the direct and circumstantial evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. State v. Captville, 448 So.2d 676 (La. 1984).
State v. Meyers, 620 So.2d 1160, 1162 (La. 1993).
Louisiana Revised Statutes 14:42 sets forth the elements of aggravated rape, stating, in pertinent part:[4]
A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
[[Image here]]
(5) When two or more offenders participated in the act.
[[Image here]]
|4For purposes of Paragraph (5), “participate” shall mean:
(1) Commit the act of rape.
(2) Physically assist in the commission of such act.
At trial, the victim testified Defendant had sexual intercourse with her twice, once vaginally and once anally. Further, she testified she did not consent to have sex with him. Essentially, the Defendant and four other men gang-raped her.
The victim’s testimony was corroborated by the DNA evidence. Forensic DNA analyst Gina Pineda of Reliagene Technologies testified regarding the genetic evidence in this case. Pineda explained that Reliagene analyzed samples from a vaginal swab. The swab contained female and male genetic material. Testing of the female genetic material did not exclude the victim as being the donor. Pineda stated male genetic material was supplied by more than one man, but the DNA analysis excluded 99.9 percent of the population. The analysis did not exclude Defendant as a donor of the genetic material. Thus, Defendant was a member of the .01 percent of the population that could have contributed to the male genetic material.
The victim’s testimony was also corroborated by the testimony of the other males who were in the house during the offense. Scott Burnett, deceased at the time of the present trial, was sleeping on a couch during the offense. His testimony from Defendant’s previous trial was read before the jury. He testified that he lived at the house where the offense occurred, as did Defendant and Michael Hoffpauir.
Burnett recalled that Defendant, Hoff-pauir, “Justin,” “another Michael,” Forrest Bradford, and the victim were in the house on the afternoon of September 28, 1998. He testified that he slept most of the afternoon and evening, although Michael and Justin woke him up “one or two times.” He also woke up at about 10:00 *132 p.m., | sand saw Michael and Justin leaving with the victim. He did not know about the incident until the next day.
Burnett testified that on the day after the incident, he asked Defendant “what all went on” the night before. Defendant replied all the other men had consensual sex with the victim, although he told Burnett that “Justin” put a pillow over her head and struck her with a pistol. Defendant also told Burnett that he had tried to have intercourse with the victim, but was unable to perform because he was too drunk. Burnett suggested that Defendant call the police, but soon all the men, including Burnett, were in police custody. Burnett also testified that Defendant and Hoffpauir hurriedly discarded or removed the victim’s belongings from the house.
One of Defendant’s accomplices, Forrest Bradford, testified at the present trial. He claimed that he had consensual sex with the victim, then left the room. He said Defendant and the other men also wanted to have sex with S.V.; she refused, but they proceeded to have intercourse with her against her will. The witness testified he did not see actual sexual entry, but saw Defendant performing “motions of sex.” Bradford stated that while Defendant was apparently having intercourse with the victim, one of the other men had a gun pointed at her head. He testified Defendant left the room, then went back in, saying he wanted to perform another sex act. However, Bradford was not sure whether Defendant actually had intercourse with the victim a second time.
Bradford acknowledged that he pled guilty to sexual battery in connection with the incident at issue. Also, he noted that Scott Burnett was laying on the couch and did not participate in the offense.
Michael Hoffpauir took the stand and admitted he had non-consensual intercourse with the victim. He also testified that Defendant had non-consensual lfivaginal and anal intercourse with S.V. The witness acknowledged that he had been convicted of aggravated rape for his participation in the offense at issue.
Michael Guillory testified that on September 28, 1999, he was doing community service at a drug treatment center in Lake Charles. S.V. was “kicked out” of the center, and Guillory saw her crying on the steps. Guillory recalled that the victim wanted to get a ride out of town, so he took her to the nearby home of his friend, Dewey Miller, who let S.V. use the telephone. She was unsuccessful in reaching anyone; she and Guillory then left Miller’s house.
While outside the house, they encountered Kristopher Schoening, a.k.a. “Justin.” Guillory, Schoening, and S.V. then smoked marijuana together. They returned to Miller’s house, but he needed to go elsewhere, so the trio walked to Defendant’s house. When they arrived, Defendant, Bradford, and Hoffpauir were there. Burnett was also there, sleeping on the couch.
Guillory and Schoening left the victim there and walked to Guillory’s house, then returned. While at Defendant’s house, Guillory noticed that Schoening had a gun under his shirt. At some point, Schoening told the victim that Bradford needed to talk to her about potential transportation. Guillory testified that when he looked in the bedroom, he saw Bradford and the victim having sex.
According to Guillory, Defendant wanted to have intercourse with S.V. after Bradford was finished. She did not want to, but Defendant and at least one of the other men pulled her pants down, and Defendant got between her legs. He then had intercourse with her. Defendant then left the room; Hoffpauir and Schoening *133 each had intercourse with her. Later, Defendant returned and appeared to have intercourse with the victim from a posteri- or position.
17During the offense, as the various men had intercourse with S.V., Sehoening had a gun, and at some point put a pillow over the victim’s head and pistol-whipped her. However, Guillory’s testimony was unclear regarding whether the pistol was actually pointed at her while Defendant had intercourse with her. Guillory testified that before the offense occurred, he told the victim that Defendant had a weapon.
On the stand, Guillory acknowledged that he had non-consensual intercourse with S.V., and that he agreed to a plea bargain in juvenile court in connection with the offense at issue.
Sehoening also took the stand and testified that Defendant had non-consensual intercourse with S.Y. Otherwise, his testimony was short and not very detailed.
We find the above evidence clearly supports the conviction. The testimony showed that Defendant and other offenders had non-consensual sexual intercourse with the victim, thus violating La.R.S. 14:42(A)(5). One of the participants had a gun and used it to threaten and batter the victim. Thus, Defendant could also be viewed as a principal to violating the first three subsections of La.R.S.14:42, as well. Also, the circumstances demonstrate Defendant acted intentionally; essentially, he participated in a gang-rape.
The gist of Defendant’s appellate argument is that the State’s witnesses were not credible. He notes the victim admitted she was intoxicated shortly before the offense, having smoked marijuana and taken Xanax. At trial, Defendant adduced expert testimony regarding the possible effects the drugs could have had on S.V.’s perception of events, or on her memory. Defense counsel conducted the following colloquy with its expert, Dr. Paul Ware (emphasis added):
Q So given the assumption of the facts that I told you about, height, weight, the drugs that were taken, the time frame, and add to that that | «about 10 o’clock that evening, later that same night, that same evening, that a deputy or a detective would have indicated that he thought she was under the influence or she was intoxicated in some sort because of that, would that seem consistent with what I’ve told you about what she took in the time frame?
A Yes, that would be consistent.
Q Okay. And if the female that had consumed those drugs and marijuana had also consumed some additionally [sic] alcohol that afternoon, would that compound her intoxication?
A Yes, that would just add to the intoxication and prolong the intoxication in regard to the amount consumed.
Q And if that person that had consumed — the female that had consumed those drugs, was involved in this traumatic event in the middle of the afternoon after consuming all those drugs, and if she was somewhat confused about what happened, would that be explained or would it be reasonable to expect that she’d be confused because of the drugs, as well as the event that occurred?
A I would expect that person to show some level of confusion, not be as clear in their thinking and in their memory because of the intoxication, and certainly if a person had a traumatic experience, like being raped, that also would add to the stress and probably make that person not as sure in regard to details, small details.
Q And certainly and that’s — that’s typically, in your view, analogize the Xanex to alcohol, I mean, that’s the affect [sic] *134 that alcohol has is that, maybe if you’ve had too much alcohol it maybe distorts your perception.
A They have really the very same affect, [sic] so if you’ve seen someone alcohol intoxicated, someone Xanax intoxicated looks, walks, behaves the same way. May have some slurring of speech in the same way, but you just don’t smell the alcohol.
Q And the combination of the drugs, the possible alcohol, and the traumatic event, I mean, those — the combination of the two would have a significant affect on their perception as far as recalling what happened?
A Well, it certainly would have a significant affect on their perception if they have a memory of the event and can talk about it, they certainly, I believe that would be their memory. I believe the perception — difficulty of the perception would be in regard to probably details of the time situation.
Q Those are all the questions.
|9This Court finds there is nothing in Ware’s testimony that indicates the victim would have been mistaken in remembering that she was gang-raped, or that she would not be able to remember who the participants were. In fact, Ware’s testimony appears to explain some of the minor inconsistencies in S.V.’s testimony that Defendant highlights on appeal. Defendant observes the victim was not clear on the order in which the men raped her, did not remember whether Schoening or Guillory had the gun, and initially told an investigator that seven men (rather than five) had raped her.
However, as the State points out, S.V. testified Defendant raped her, that he was the second male to do so, that he did so twice, and that the second rape was anal. This Court finds that her testimony also clearly showed that Defendant’s actions took place in the context of a gang-rape in which other men also had non-consensual intercourse with the victim.
Defendant also notes various inconsistencies among the testimonies of the other males who participated in the offense. This Court finds the chief inconsistency resulted from the attempts of a couple of them to relate versions of the incident that were partially exculpatory to themselves. However, none of their versions were exculpatory toward Defendant; all of the other participant’s testimonies directly supported the victim’s contention that Defendant raped her.
Defendant also complains that the testimonies of Forrest Bradford and Michael Guillory lacked credibility because they received comparatively lenient deals from the State. As already noted, Bradford pled to sexual battery, and Guillory was set to plead as a juvenile. Further, Guillo-ry, Hoffpauir, and Schoening all testified pursuant to the court’s order to do so. When Schoening was initially called to testify, he had trouble recalling events regarding the offense. Then he watched his earlier, videoj*ecorded10 statements during lunch and later returned to the stand. As discussed earlier, Schoening then stated that Defendant participated in the offense.
Each of the men denied that he was inculpating Defendant in return for favors from the State. As Defendant’s appellate counsel acknowledges in brief, credibility is within the province of the fact-finder. In view of all the testimony supporting the basic elements of the crime, and the supporting DNA evidence, this Court finds the jury was reasonable in finding the State’s witnesses credible, and in finding Defendant guilty of aggravated rape.
For the reasons discussed, this assignment lacks merit.
*135 ASSIGNMENT OF ERROR NO. 2 (Pro Se Assignment of Error No. 1)
These assignments, argued in a supplemental brief by counsel, and in a pro se brief, allege the trial court erred by denying Defendant’s motion to quash. The motion was based upon the statutory time limitations for bringing a case to trial. As noted in the procedural history recited at the beginning of this opinion, Defendant’s first trial resulted in a mistrial. Defendant complains his second trial commenced untimely.
The time limitations for bringing a defendant to trial are governed by La.Code Crim.P. art. 578:
Except as otherwise provided in this Chapter, no trial shall be commenced:
(1) In capital cases after three years from the date of institution of the prosecution;
(2) In other felony cases after two years from the date of institution of the prosecution; and
(3) In misdemeanor cases after one year from the date of institution of the prosecution.
The offense charged shall determine the applicable limitation.
InThe grand jury handed down the indictment on December 3, 1998. Defendant initially stood trial on October 17, 2000. The court declared a mistrial on October 20, 2000, and the Defendant’s second trial commenced on April 1, 2002. The State argues that a Defense motion to recuse suspended the running of the time limitation imposed by Article 578. Judge Alcide Gray signed the recusal order on June 20, 2001, but it was not filed until July 3, 2001.
The State notes La.Code Crim.P. art. 580 (emphasis added):
When a defendant files a motion to quash or other preliminary plea, the running of the periods of limitation established by Article 578 shall be suspended until the ruling of the court thereon; but in no case shall the state have less than one year after the ruling to commence the trial.
Defendant cites La.Code Crim.P. art. 582: “When a defendant obtains a new trial or there is a mistrial, the state must commence the second trial within one year from the date the new trial is granted, or the mistrial is ordered, or within the period established by Article 578, whichever is longer.”
However, Article 580 applies to retrial situations otherwise governed by Article 582. State v. Brooks, 505 So.2d 714 (La. 1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363(1987), Thus, as Defendant’s trial commenced less than one year after the recusal ruling, the State argues it was timely. The lower court agreed and denied the motion.[5]
This Court has not found a case discussing whether a recusal motion is a “preliminary plea.” However, such a motion would seem to be of the same genera as a motion to quash, and thus be covered by Article 580. See, e.g., La.Code Crim.P. art. 912(B), in which motions to quash and motions to recuse are named as motions for which the State can appeal from adverse judgments. It is clear that the second trial began within a year of the recusal. Defendant’s arguments ignore the clear | ^statutory language granting the State one year from the ruling to commence trial. However, his attorney-filed supplemental brief neither provides jurisprudence nor suggests a logical reason to ignore the language of article 580. *136 Defendant’s pro se brief claims that Judge Gray recused himself. This is plainly incorrect, as the record shows his trial counsel submitted a motion on this matter on June 20, 2001. In the pro se brief, Defendant footnotes part of article 580, omitting the language that grants the State one year from a ruling on a preliminary motion to begin trial. Thus, his arguments ignore or omit the statutory authority of Article 580.
As the State observes, it was required to retry Defendant within one year of the recusal ruling, and it did so.
For the reasons discussed, this assignment lacks merit.
PRO SE ASSIGNMENT OF ERROR NO. 2
In his second pro se assignment, Defendant argues the court erred by ordering Guillory, Hoffpauir, and Schoening to testify. In his argument, he asserts the witnesses’ constitutional rights not to incriminate themselves. U.S. Const, amend. V.
However, the Defendant does not have standing to argue the Fifth Amendment rights of other individuals. State v. Gaspard, 96-1279 (La.App. 3 Cir. 2/11/98), 709 So.2d 213, writ denied, 98-582 (La.7/2/98) 724 So.2d 202.
Therefore, the assignment lacks merit.
CONCLUSION
Defendant’s conviction and sentence are affirmed.
AFFIRMED.

. The victim's name is not used in compliance with La.R.S. 46:1844.

. Minus her bra, which had been cut off.

.Two of Defendant's accomplices have already been before this court. State v. Hoff-pauir, 99-1927 (La.App. 3 Cir. 10/11/00), 772 So.2d 181, State v. Schoening, 00-764 (La. App. 3 Cir. 12/20/00), 807 So.2d 252.

. The sections cited comport with the provisions read to the jury.

. The Court obtained two supplemental records, one filed with this court on November 6, 2002, and the other filed on November 15, 2002.