STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

05-1410

STATE OF LOUISIANA

VERSUS

J.F.

**********

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 125998-B
HONORABLE WILLIAM J. BENNETT, DISTRICT JUDGE

**********

MARC T. AMY
JUDGE

**********

Court composed of Marc T. Amy, Elizabeth A. Pickett, and J. David Painter, Judges.

AFFIRMED; REMANDED WITH INSTRUCTIONS.

Charles A. Riddle, III
District Attorney
Post Office Box 1200
Marksville, LA   71351
(318) 253-6587
COUNSEL FOR APPELLEE:
     State of Louisiana

Edward Kelly Bauman
Louisiana Appellate Project
Post Office Box 1641
Lake Charles, LA   70602-1641
(337) 491-0570
COUNSEL FOR DEFENDANT/APPELLANT:
     J. F.

AMY, Judge.

The defendant was charged with three counts of aggravated rape in violation of La.R.S. 14:42. Following a bench trial, the defendant was found guilty as charged. The defendant filed a motion for new trial, which the trial court denied before imposing sentence. The defendant was sentenced to life imprisonment at hard labor on each count, to be served without benefit of parole, probation or suspension of sentence. The sentences were ordered to run concurrently. The defendant subsequently filed a motion for new trial based on newly discovered evidence. The trial court denied this motion. The defendant now appeals, arguing that there is insufficient evidence to prove the crime of aggravated rape beyond a reasonable doubt. For the following reasons, we affirm and remand with instructions.

**Factual and Procedural Background**

The record indicates that O.F.[1] was born on September 28, 1990 and is the son of F.B. and the defendant. When the couple divorced in 1998, O.F. went to live with his mother. The defendant shared joint custody of O.F. and had visitation every other weekend. The defendant testified that in April 2003, O.F. begged the defendant to "take him in," which he did. He further testified that O.F. told him that his stepfather was physically abusing him and on one occasion, slapped him so hard that he wet his pants. The defendant immediately sought custody of O.F., and a hearing on the matter was held on May 30, 2003. The trial court granted joint custody to both parents with the defendant designated as the domiciliary parent.

---

[1] Pursuant to La.R.S. 46:1844, the initials of the parties involved have been used throughout.

O.F. moved in with the defendant, his wife, C.F.[2], and their three children. O.F. testified that they resided in a two bedroom house and that he occupied one room and the defendant and C.F. occupied the other. He further testified that during the last months of his stay at the defendant's house, the defendant's stepchild from a previous marriage came to live with them as well as C.F.'s oldest son. According to O.F., when he first moved in, "everything was all nice[.]" Nevertheless, he stated that the defendant and C.F argued frequently and that these arguments would sometimes turn violent. O.F. also alleged that the defendant sexually abused him on three different occasions.

O.F. described the first incident that happened in May 2004. O.F. testified that when the defendant and C.F. began to argue, he went into his bedroom and played video games. The defendant entered his bedroom and closed the door, although O.F. was unsure if it was locked. O.F. testified that the defendant asked him if he wanted to do something, to which O.F. replied: "What?" According to O.F., the defendant grabbed him and threw him down on the bed. O.F. was lying on his stomach, and the defendant was on top of him. He remembered the defendant yelling and asking him "what you gonna do now and stuff like that."[3] O.F. stated: "I thought I'd done something wrong because he [was] all fussing and hollering." O.F. testified that the defendant pulled his shorts off and "stuck his private in [him,]" moving it back and forth. The defendant did not say anything. O.F. also testified that he knew that the defendant had ejaculated because he "felt something go inside of [him,]" and he saw some "white looking gunk" draining out of him and on his bed.

---

[2] According to the defendant's testimony, after his divorce from F.B., he married T.G., whom he divorced after a short period of time.

[3] It should be noted that on cross-examination, O.F. denied that the defendant yelled at or said anything to him.

According to O.F., the defendant left the room without saying anything, locked the door, and "took a shower and went to bed like nothing had happened." O.F. explained that he did not bleed that night, but he was hurting and that the next morning, his "butt was sore raw and [he] was bleeding real bad." O.F. testified that he did not tell anyone about the incident because he did not know what happened and "every time [he] would try to say something[, the defendant] was like I got full custody of you[. Y]ou're mine now."

According to O.F, the second incident occurred in July 2004. The defendant and C.F. were arguing, and O.F. retreated to his bedroom. O.F. stated that the defendant walked into his room with a tube of what he described as "lube" or jelly in his pocket. Without saying anything, the defendant pulled the covers off of O.F., grabbed him by his neck, and "stuck his worm" in his "butt." O.F. testified that the defendant ejaculated because he noticed that the "same white, dripping gunk was there[.]" He also testified that he was bleeding and was not allowed to go to the bathroom.

The third and final incident occurred around August 2004. The defendant and C.F. were arguing. According to O.F.'s testimony, he was in his bed going to sleep when the defendant walked in and closed the door. O.F. remembered that the defendant did not have any lube with him. He testified that the defendant grabbed him by his neck, and his face was down in the pillow. He heard the defendant's jeans unzip, and the defendant stuck "it" inside of him. O.F. believed that the defendant was moving faster because "he was trying to hurry up and get out and go back and act like nothing was happening." According to O.F., the defendant ejaculated because

3

he saw the same substance that he had seen after the first two incidents. He testified that he bled from his butt.

On cross-examination, O.F. admitted that the defendant did not threaten him during any of these encounters. However, he explained that he felt threatened because of "the violence in the house," the presence of a gun in the house, and because on "one occasion [C.F.] came at [the defendant] with a knife and [he] took her and swung her across the house." O.F. also explained why he did not tell anyone about the incidents. According to O.F., the defendant made various threats to him the day after the incidents occurred. The defendant threatened to beat him, kill him and his mother, and kill his brothers if he told anyone. He also stated that the defendant would prevent him from telling of the sexual abuse by stating that "they won't believe you. You live under my house, I have full custody and you wanted to live over here." O.F. was also concerned about how his mother would handle his disclosure. He commented: "[I]t's hard enough having to tell a complete stranger, someone that you just met much less telling someone you've known your whole life. I mean no parent should have to hear this." He also stated that his mother has "a bad heart," and he was worried about her health.

O.F. stated that his mother was concerned about him because he was depressed, he would not talk to her, and his grades dropped. F.B. began taking O.F. to see Ms. Jane Hyde, a licensed clinical social worker, to help O.F. with his troubles. O.F. first met with Ms. Hyde on October 12, 2004. O.F. testified that some time after this visit, he began bleeding from his butt and that he and F.B. did not know why. Upon the advice of Ms. Hyde, F.B. brought O.F. to the doctor where he was examined by Ms. Clara Coutee, a nurse practitioner. According to the record, Ms. Coutee found that

O.F.'s "rectum was dilated like that of a 70 [year] old person." In her report, Ms. Coutee noted "under the rectal exam loose, dilated, anal sphincter, able to emit two fingers, large amount of hard stool in ampulum, or the base of the rectum, hemorrhoids[.]" Ms. Coutee referred O.F. to a pediatric gastroenterologist for evaluation of rectal bleeding and a dialated rectal sphincter. Because Ms. Coutee opined that the rectal bleeding may have been caused by sexual abuse, she spoke with someone at the Office of Child Support about the matter. The district attorney's office was also notified.

On October 29, 2004, O.F. was examined by Dr. Husam Sukerek, a pediatrician and pediatric gastroenterologist. Dr. Sukerek found that O.F. had normal anal tone and that a test for fecal occult blood (blood that cannot be seen by the naked eye) was negative. He also found minimal redness, which he explained is common in thirty percent of children. Dr. Sukerek diagnosed O.F. with incoprecis, which is the inability to control bowel movements. He admitted on cross examination that there is nothing in his findings that could dispute that O.F. was sexually abused. Dr. Sukarek testified that because child abuse was a concern, he recommended evaluation by a child sexual abuse expert.

Ms. Julie Tandeski of the Children's Advocacy Center interviewed O.F. on November 5, 2004. Ms. Tandeski videotaped her interview with O.F. in which he revealed that the defendant sexually abused him on various occasions. O.F. described the incidents to her. After reviewing the tape, detectives arrested the defendant for two counts of rape.

The Office of Child Support and the district attorney's office referred O.F. to Dr. L.J. Mayeux, the coroner of Avoyelles Parish. On December 10, 2004, Dr.

5

Mayeux interviewed and examined O.F. According to Dr. Mayeux, O.F. recounted three incidents of sexual abuse. Dr. Mayeux's examination of O.F. revealed a loose rectal sphincter for a child his age with very loose tone. He explained that a bowel movement cannot cause the sphincter to become loose and the rectal area heals after constipation and bowel movements. Dr. Mayeux stated that O.F.'s rectal bleeding is consistent with anal sexual intercourse. He found that O.F. also had redness and tenderness in the para rectal region. Dr. Mayeux testified that he could not say with any degree of medical certainty that the redness was related to the allegations of abuse that occurred approximately four to five months earlier. Nevertheless, based on the consistency between the physical findings and the reports that O.F. gave him, Dr. Mayeux concluded that O.F. was sexually abused by the defendant.

Ms. Hyde, O.F.'s counselor, testified that O.F. reported the abuse to her on January 19, 2005, after eleven visits. According to Ms. Hyde, O.F. was only able to describe one incident to her.

On December 16, 2004, the defendant was indicted by a grand jury for three counts of aggravated rape. Following a bench trial, the trial court found him guilty as charged. The defendant's motion for new trial was denied, and the trial court sentenced him to the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on each count. The sentences were ordered to run concurrently with each other. The defendant subsequently filed a motion for new trial based on newly discovered evidence, which was denied by the trial court. The defendant now appeals his conviction, arguing that the evidence presented at trial was insufficient to prove his guilt beyond a reasonable doubt.

6

**Discussion**

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find three errors patent.

The trial court denied the defendant's motion for new trial on the same day as sentencing. Louisiana Code of Criminal Procedure Article 973 requires a delay of at least twenty-four hours between the denial of a motion for new trial and sentencing. However, this error is harmless as the defendant received a mandatory life sentence. *See State v. Porter*, 99-1722 (La.App. 3 Cir. 5/3/00), 761 So.2d 115.

Further, the minutes of sentencing are in need of correction. The minutes state:

> As required by Article 890.1 of the Code of Criminal Procedure and Article 894.1D of Code of Criminal Procedure, the court designated that the crime involved was not a crime of violence or attempted crime of violence as defined or enumerated in [La.]R.S. 14:2[(13).]

(All caps format and quotation marks omitted). According to the transcript of sentencing, the trial court made no mention as to whether or not the crimes committed were crimes of violence. Thus, this case is remanded with instructions to the trial court to delete the portion of the minutes indicating that the trial court stated that the crime committed was not a crime of violence.

Finally, the minutes of the trial court's verdict indicate that the trial court found the defendant guilty of the "above charge." The minutes list the charge as "aggravated rape." However, the defendant was charged with three counts of aggravated rape, and the transcript of the trial shows that the trial court found the defendant guilty of all three counts. Therefore, the minutes of the trial court's verdict

7

shall be amended to reflect that the trial court found the defendant guilty of three counts of aggravated rape.

*Insufficient Evidence*

The defendant contends that the evidence presented by the State was insufficient to find him guilty of aggravated rape beyond a reasonable doubt. Specifically, the defendant contends that the State failed to prove that O.F. was prevented from resisting the acts by threats of great and immediate bodily harm, accompanied by apparent power of execution. The defendant also questions O.F.'s credibility, arguing that there are "internal irreconcilable inconsistenc[i]es" in O.F.'s testimony regarding the number of rapes and the details of each incident.

Louisiana Revised Statutes 14:42 provides in pertinent part:

> A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
> . . . .
>
> (2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.

In *State v. Touchet*, 04-1027, pp. 1-2 (La.App. 3 Cir. 3/9/05), 897 So.2d 900, 902, this court stated:

> With regard to sufficiency of the evidence, this court set forth as follows in *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27:
>
>> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v.*

8

*Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See King*, 436 So.2d 559, citing *State v. Richardson*, 425 So.2d 1228 (La.1983).

In order for the State to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt. In order for this court to affirm a conviction, the record must reflect that the State has satisfied this burden of proving the elements of the crime beyond a reasonable doubt. *State v. Kennerson*, 96-1518 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367.

After a review of the record, we find that there is sufficient evidence to support the defendant's conviction. O.F. testified that on three occasions, the defendant entered his room and closed the door. O.F. stated that the defendant may have locked the door as well. The defendant forced O.F. to engage in sexual acts by grabbing him by his neck and throwing him onto the bed. Although there may not have been any verbal threats while the incidents were occurring, O.F. testified that he felt threatened due to the violence in the home as well as the presence of a gun in the house. O.F. described occasions where the defendant became violent with him and C.F. It should be reiterated that the defendant would sexually abuse O.F. after engaging in an argument with C.F. Furthermore, the defendant made various threats against O.F., his mother, and his brothers if O.F. told anyone about the sexual abuse. The defendant would also remind O.F. that he had "full custody" of him.

Despite all of this, O.F. eventually revealed the sexual abuse to Ms. Tandeski of the Children's Advocacy Center, Ms. Hyde, a clinical social worker, and to Dr. Mayeux, the coroner of Avoyelles Parish. As defense counsel has pointed out, there are inconsistencies in O.F.'s pre-trial statements and his testimony at trial. The trial

court noted these inconsistencies but still found O.F. to be a credible witness. In its reasons for judgment, the trial court stated:

Here are some findings that I will make preliminary to the ruling. First, it is without any doubt in my mind that [O.F.] was raped. There are physical findings, testified to by Dr. Mayeux and it's[sic] certainly the rape was not ruled out by the doctor who testified from Many and he did confirm that some of what he saw could have come from that. [O.F.] was raped. . . . What it boils down to if we know, if I believe and I do and convinced beyond any reasonable doubt that [O.F.] was raped. What it gets down to is the credibility of [O.F.] to a large extent, as to whether or not his version of what happened and who raped him is correct. The defense has presented a very, very compelling argument and submitted some testimony in an attempt to show that [O.F.] is not credible.

Now I'm going to review some of the things that were testified to in this court. First of all[,] Dr. [L.J.] Mayeux who has a lot of experience in this field and forensics as a coroner, as a medical doctor[ made] an extensive interview of [O.F.], one of the longest ones he testified to that he has ever made in this professional career. His words exactly were that [O.F.'s] demeanor suggested credibility. Dr. Mayeux testified that [O.F.]'s delay in telling what happened to him was normal because of his fear of retribution and because of the same that it would bring to him for people to know what he was claiming had happened to him. Dr. Mayeux also testified that it was not unusual for [O.F.] or a child that had been abused such as [O.F.] to give different versions of the same event. Jane Hyde, a counselor was called by the defense and she had 22 counseling sessions with [O.F.]. She found [O.F.] to be very depressed. She also found him to be very credible. She found that [O.F.'s] reports and we must remember that [O.F]. did not report this allegation of rape to Ms. Hyde until after many sessions had already been had with Ms. Hyde. The majority of the sessions before that with Ms. Hyde were dealing with abuse in the home, violence and domestic violence in the home[, w]hich she testified to was very serious. Ms. Hyde testified that it was not [ab]normal for [O.F.] to wait on his disclosure. She found [O.F.] to be very credible. She said specifically, [O.F.] does not lie.

So what's the next version to look at is the version he gave in court. In court [O.F.] presented himself in general as a credible and smart young man. He talked at length about the threats his daddy continuously made that I have full custody and when you read the transcript of the custody hearing . . . and [see] how contentious this fight was, it's not unusual to consider that [the defendant] would tell his son, I have full custody you're mine[.] Also the timing of the events on the tape and the time of the events in the courtroom were very similar.

10

Although not exact which if they would have been exact it would have been very strange. It was noted in court that the first person that he told I believe was Jane Hyde. And he told her of only one event. Then he told Dr. Mayeux more, then he told more on the advocacy center then Dr. Mayeux, I don't know how it went. And then he told more in court . . . . Which goes back to what Dr. Mayeux and Jane Hyde have said, it's not unusual to have some of that suppressed [for] it come[s] out later. Did th[e] defense show that some of [O.F.'s] testimony had very different versions in the events[?] Yes, [O.F.] did give very different versions of some of the events that happened. It was not exactly the same in each event. What [O.F.] is consistent about is that he was raped. He was raped by his father. That was his consistent testimony on each of the three occasions. He described them in court, which was a hard thing for him to do, he described them on tape.

This court does find, considering that . . . considering all of the review of [O.F.'s] testimony in court, [O.F.'s] taped statement, of [O.F.'s] versions given to all the doctors that [O.F.] presented himself as a very smart yet extremely troubled young man but [whose] testimony concerning this case is entirely credible and accepted by this court.

In *State v. Schexnaider*, 03-144, p. 9 (La.App. 3 Cir. 6/4/03), 852 So.2d 450, 457 (quoting *State v. Williams*, 00-981, p. 7 (La.App. 5 Cir. 4/11/01), 786 So.2d 805, 810, *writ denied*, 01-1377 (La. 3/28/02), 812 So.2d 646), a panel of this court explained:

> The testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense. *State v. Hotoph*, 99-243 (La.App. 5th Cir.11/10/99), 750 So.2d 1036, 1045, *writ denied*, 99-3477 (La.6/30/00), 765 So.2d 1062 and 00-0150 (La.6/30/00), 765 So.2d 1066; *State v. Hawkins*, 99-217 (La.App. 5th Cir.7/2/99), 740 So.2d 768, 769; *State v. Hubbard*, 97-916 (La.App. 5th Cir.1/27/98), 708 So.2d 1099, 1104, *writ denied*, 98-0643 (La.8/28/98), 723 So.2d 415.
>
> The credibility of a witness, including the victim, is within the discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *Id*. "[T]he *Jackson* standard does not serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the fact finder at trial." *State v. Juluke*, 98-341 (La.1/8/99), 725 So.2d 1291, 1293.

In the instant case, the State not only presented O.F.'s testimony, but it also presented medical evidence that supported O.F.'s testimony. In addition, Dr. Sukerek, a defense witness, could not dispute that O.F. was sexually abused. When we examine the evidence in the light most favorable to the prosecution, we determine that a rational trier of fact could have found the defendant guilty of three counts of aggravated rape.

Accordingly, this assignment lacks merit.

### DECREE

For the above reasons, we affirm the defendant's conviction. The case is remanded, and the trial court is instructed to delete the portion of the minutes indicating that the trial court stated that the crime committed was not a crime of violence. Furthermore, the minutes of the trial court's verdict shall be amended to reflect that the trial court found the defendant guilty of three counts of aggravated rape.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**