NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 12-31


STATE OF LOUISIANA

VERSUS

DIONDRE D. ROMERO



**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 51565
HONORABLE DURWOOD WAYNE CONQUE, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Oswald A. Decuir, Jimmie C. Peters, and Billy Howard Ezell, Judges.


**AFFIRMED WITH INSTRUCTIONS.**


**Michael Harson**
**District Attorney, Fifteenth Judicial District Court**
**P.O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Beth Smith Fontenot**
**Louisiana Appellate Project**
**P. O. Box 3183**
**Lake Charles, LA 70602**
**(337) 491-3864**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Diondre D. Romero**

**Laurie A. Hulin**
**Assistant District Attorney**
**Fifteenth Judicial District Court-Vermilion Parish**
**P. O. Box 175**
**Abbeville, LA 70511**
**(337) 898-4320**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Diondre D. Romero**
**Louisiana State Penitentiary**
**General Delivery**
**Angola, LA 70712**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Diondre D. Romero**

**EZELL, Judge.**

The Defendant, Diondre D. Romero, was indicted by a grand jury with six counts of aggravated rape occurring in April and May of 2009. The Defendant was convicted as charged after a bench trial held July 19, 2011. At the October 27, 2011 sentencing, the Defendant was sentenced on each count to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The Defendant is before this court appealing his conviction.

## FACTS

The facts of this case are set forth in Assignment of Error Number One below.

## ASSIGNMENT OF ERROR NUMBER ONE and Pro Se Assignment of Error

The Defendant contends the evidence presented by the State was insufficient to convict him of six counts of aggravated rape because the victim's testimony contained internal inconsistencies and conflicted with other testimony presented at trial. Additionally, the Defendant claims the physical evidence was inconclusive as to the occurrence of rape.

Louisiana Revised Statutes 14:42(A) provides in pertinent part:

> Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
>
> . . . .
>
> (4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense.

In *State v. J.F.*, 05-1410, pp. 8-11 (La.App. 3 Cir. 4/5/06), 927 So.2d 614, 619-21, *writ denied*, 06-1424 (La. 12/8/06), 943 So.2d 1060 (alteration in original), this court stated:

> In *State v. Touchet*, 04-1027, pp. 1-2 (La.App. 3 Cir. 3/9/05), 897 So.2d 900, 902, this court stated:

With regard to sufficiency of the evidence, this court set forth as follows in *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. *See King*, 436 So.2d 559, citing *State v. Richardson*, 425 So.2d 1228 (La.1983).

> In order for the State to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt. In order for this court to affirm a conviction, the record must reflect that the State has satisfied this burden of proving the elements of the crime beyond a reasonable doubt. *State v. Kennerson*, 96-1518 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367.

> . . . .

In *State v. Schexnaider*, 03-144, p. 9 (La.App. 3 Cir. 6/4/03), 852 So.2d 450, 457 (quoting *State v. Williams*, 00-981, p. 7 (La.App. 5 Cir. 4/11/01), 786 So.2d 805, 810, *writ denied*, 01-1377 (La.3/28/02), 812 So.2d 646), a panel of this court explained:

> The testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense. *State v. Hotoph*, 99-243 (La.App. 5th Cir.11/10/99), 750 So.2d 1036, 1045, *writ denied*, 99-3477 (La.6/30/00), 765 So.2d 1062 and 00-0150 (La.6/30/00), 765 So.2d 1066; *State v. Hawkins*, 99-217 (La.App. 5th Cir.7/2/99), 740 So.2d 768, 769; *State v. Hubbard*, 97-916 (La.App. 5th Cir.1/27/98), 708 So.2d 1099, 1104, *writ denied*, 98-0643 (La.8/28/98), 723 So.2d 415.

The credibility of a witness, including the victim, is within the discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *Id.* "[T]he Jackson standard does not serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the fact finder at trial." *State v. Juluke*, 98-341 (La.1/8/99), 725 So.2d 1291, 1293.

At trial, the victim, L.T., testified that her birthdate is October 31, 1999, making her eleven years old at the time of trial.[1] For the two-and-one-half years preceding trial, L.T. lived with her grandmother. Prior to that time, she resided with her mother, the Defendant, whom she calls "Drey," her sister, and two brothers on Graceland Avenue. According to L.T. she lived with "Drey" for a year and a half until the State removed her from her mother's custody and placed her with her grandmother.

L.T. testified that during the time she lived with her mother and the Defendant, she was sexually abused or raped. L.T. confirmed that she had talked to (OCS), doctors, her grandmother, her mother, her nanny, and Ms. Nicki from Hearts of Hope about the incidents. L.T. described the first incident as follows:

A. He told me to go in the room because we was going play a game, and I went, and he turned the lights off, and he locked the door, and he pushed me on the bed, and he pulled his pants down, and he pulled mine's down, and he held me down, and he - - I don't know how to put this - - he stuck his prostate into my vagina.

L.T. testified that after the Defendant did this, she went into the bathroom and washed herself off as he instructed her to do. She noticed "white stuff" and blood coming out of her vagina. According to L.T., this occurred six times. When questioned how she knew it was six times, she replied, "[b]ecause I can remember."

According to L.T., this incident occurred in her mother's and the Defendant's bedroom while her sister and two brothers were in living room. When asked where her mother was, L.T. replied that she was an exotic dancer at a strip club. She worked nights and returned home at 2:00 or 3:00 in the morning. While her mother was at

_____

[1] As required by La.R.S. 46:1844(W), the initials of the parties involved are used to protect the victim's identity.

work, L.T. stayed with the Defendant. However, her nanny, Candida, would occasionally stay with her.

The second incident was described by L.T. as follows:

> I was coming out the bathroom, and I went into my room, because we had two bathrooms, and I went into my room to get my clothes from taking a bath, and he was in the room and locked the door and turned the lights off and did what he did the first time.

This incident took place in the "kids' room" while her brothers and sister were in the living room. The Defendant stopped when his brother, Sean Romero, knocked on the door. L.T. testified that the Defendant left to talk to his brother in his bedroom and L.T. went into the bathroom.

L.T. recalled another incident that occurred when she was in the bathroom. The Defendant entered the room, turned off the lights, pushed her on the floor, and "did what he did." After he left, she got into the tub and "washed [herself] out" "[b]ecause [she] didn't feel right." Her mother was not at home when this incident occurred.

L.T. testified she recalled another incident when she was in "the room by [herself] looking for clothes from [her] mamma's box." The Defendant entered the room, turned off the lights, and "did what he did all the other times." When he left the room, the victim cleaned herself in the tub. L.T. confirmed that "this" occurred about six times, including a time when she and Drey were alone and her siblings were not at home. According to L.T., adults were not present in the house when the incidents occurred. L.T. testified that the incidents occurred only at the house on Graceland.

L.T. testified that she never told her mother because the Defendant threatened her and she was scared. L.T. testified she eventually told her grandmother that "Drey" put his prostate in her vagina. Her grandmother asked, "you're not a virgin anymore?" and L.T. said "no." L.T.'s grandmother then called Ms. Katie.[2]

---

[2] It appears the victim was referring to Katie McConnell from OCS.

4

L.T. testified she had bruises on her arms and legs which she did not show to anyone. During April and May, she wore a jacket (a goldish/brown South Pole jacket) to school despite the hot weather. On cross-examination, L.T. testified her mother did not ask her about why she was wearing a jacket because "she was too full of drugs." L.T. testified her sister inquired but L.T. did not tell her why.

On cross-examination, L.T. testified that she first reported that these incidents occurred six or seven times, but when she could not remember the seventh incident, she maintained that the incidents occurred six times. L.T. testified that when the incidents occurred, she tried to push the Defendant off her. L.T. testified she tried to scream for help but the TV or music would be too loud for the others to hear her.

L.T. testified on cross-examination that she did not tell anyone that an incident occurred on May 13, 2009. Nor did she recall telling anyone that she had no bleeding as a result of the incidents. She also testified she could not recall when her mother went to a drug rehab program, but she recalled she was there for approximately two weeks. She testified that she did not recall telling anyone that this did not happen while her mother was in rehab. G.T., L.T.'s grandmother, testified that she had a conversation with L.T. that prompted her to call police. L.T. told her that the Defendant raped her six times. L.T. told G.T. that while her mother was away, she went in the room with the Defendant and he closed the door and turned up the music. He pulled her pants down and his pants down and "put it in her." L.T. said the Defendant put his legs over hers and held her arms so she would not move. L.T. said the Defendant told her if she said anything he would kill her mother. When the incident was over, L.T. washed herself off in the bathroom because she felt dirty. Although G.T. initially testified that L.T. did not talk about anything coming out of her body, after being shown her 2009 written statement to the Abbeville Police Department, she recalled that L.T. told her she had not bled but she had slimy stuff

coming from her body. G.T. testified she called Katie McConnell from OCS and Ms. McConnell came and questioned L.T.

Dr. Myriam Hutchinson, the coroner for Vermilion Parish, examined the victim on June 18, 2009. She testified that the physical examination of the pelvic and vulvar area was normal but the victim's hymen was not intact. She testified that this can result from any penetration, and she confirmed that this type of injury is consistent with penile penetration. According to Dr. Hutchinson there was no way to tell how long the hymen had been missing.

On cross-examination Dr. Hutchinson confirmed that some women are born without a hymen. She was further asked, "Isn't it also a fact that hymens can be injured or completely lost through certain activities? Playing, sports, things of that nature can cause damage to the hymen?" to which she responded, "If there is a penetration, it can happen." Dr. Hutchinson confirmed that she found no evidence of any tears, lesions, or scars in the victim's vaginal area. She was asked if she found this unusual; she explained that it was normal not to see any of this after the passage of a month. Dr. Hutchinson further explained there would be no scars unless there was a major tear; the loss of the hymen would not result in tears, but it could cause bleeding.

Dr. Hutchinson was asked if she found it unusual that there was no bleeding. She explained that she would not expect to find bleeding because "usually penetration like this will heal like in six, seven days." When asked whether it was unusual to have no bleeding with the loss of the hymen, Dr. Hutchinson stated, "It can bleed, but in some cases they don't bleed."

Dr. Hutchinson was asked what the victim reported to her. Her records stated, "He hold my hands back, put his thing in front, no back, nor in the mouth, no finger, locked the door, turned off the lights. Sister was trying to get in, and she couldn't come inside the room." The nurses wrote in the report that the last occurrence was on May 13, 2009.

On redirect examination, Dr. Hutchinson was asked whether the injury was consistent with sexual abuse considering the history that was provided and the results of her examination; she responded that it was.

L.T.'s mother, T.T., testified that from March 31, 2009 through May of 2009, she lived on Graceland Avenue with her four children and the Defendant. The Defendant kept the children while she worked at a strip club from approximately 5:00 p.m. until 2:30 or 2:45 a.m. Her living arrangement with the Defendant ended when she went to jail on May 13, 2009. According to T.T., during the time she lived with the Defendant, the victim did not complain of sexual abuse.

On cross-examination, T.T. testified that she entered rehab at the end of April or beginning of May, and she was there for a week. She testified she was at home for approximately a week before her arrest and during that time she did not work. During that time, the children were left alone with the Defendant if T.T. had to go somewhere such as the store.

T.T. was questioned about Mother's Day (May 10th) weekend that year. She testified that the children were at her mother's house on Friday and Saturday, and she and the Defendant picked them up on Sunday. According to T.T., on Sunday (Mother's Day), they went to the Defendant's mother's house with the children, and he was not left alone with the children that day. On Monday, T.T. got a call saying that the victim was sick at school. OCS picked her up and brought her to the hospital. T.T. was also at the hospital because she had been in a car wreck that day. According to T.T., the Defendant brought the children to his mother's house. L.T. left the hospital with the Defendant that night without seeing the doctor because it was taking too long, and she was feeling better. According to T.T., the Defendant took L.T. to his mother's house with the rest of the children.

T.T. was released from the hospital and went home that night after purchasing medication for L.T. T.T. and the children went to bed. On Wednesday, T.T. was

7

arrested; OCS picked up the children when they got off the school bus and took them to T.T.'s mother's house. T.T. confirmed that from Friday to the date of her arrest, the Defendant was not alone with the children. According to T.T., she learned of L.T.'s allegations against the Defendant on the day before Father's Day in 2009 while she was incarcerated. T.T. testified that during the time she and the Defendant lived together, she did not see any signs of abuse.

On redirect examination, T.T. acknowledged that she was under the influence of drugs in April of 2009 which may have made it difficult to actually perceive what was going on. She also confirmed there were times when she was out of rehab and not employed at the Paradise Club that she may have been gone from the home shopping or out with friends late at night:

> Q. Would there have been opportunity - - like you said, you went to the store - - where Diondre was left, Mr. Romero, was left alone with the children?
>
> A. Uh-huh ("Yes").
>
> Q. Would there have been times that you went out with the girls or out with your friends late at night to another club at that point in time?
>
> A. Maybe. Most likely.
>
> Q. Most likely?
>
> A. Yes, ma'am.
>
> Q. Would this have been during the hours that would have been similar to the hours that you worked?
>
> A. Yes.

T.T. was asked whether she thought it was odd that L.T. wore a coat to school during the months of April and May. She responded that she did not find it odd because L.T. told her that it was because she was cold in her classroom.

Nicolette Joseph of "Hearts of Hope, the Children's Advocacy Center" testified she interviewed L.T. on June 24, 2009. The recording of the interview was played during the trial. In the interview, the victim said that while her mother was at work

8

(from 7 p.m. to 2 a.m.), the Defendant would tell her to come see because he had something for her. He put his "thing" in her, and when her sister attempted to open the door, he would tell her they were playing. L.T. said this occurred in her mother's room after the Defendant closed and locked the door. According to L.T., the Defendant put his "thing" in her six or seven times when she was nine.

L.T. was asked what happened the first time he did this, and L.T. responded that after the Defendant did this, he told her to go wipe herself. She said white slimy stuff came out of her "flower." She said his "thing" touched the inside of her "flower." She said she never told anyone about what he did because he had told her on more than one occasion that he would beat her.

During the incidents, L.T. said the Defendant would grab her arms and legs and put his "thing" in her "flower" after he had taken her clothes off and put them on side of the bed. When he put his thing in her "flower," she said it made her feel nasty and it would hurt her "flower." She said his legs would move around, and he would move his "thing" in and out. He would stop (she didn't know why), and he would then make her use the bathroom.

L.T. said this would occur in the dark, and she said she never saw the Defendant's "thing." She said this occurred a few months before the State took her away from her mother. She would wear a jacket to cover the bruises on her wrists and long socks to cover the bruises on her ankles. According to L.T., no one else has ever put their "thing" in her "flower."

Near the end of the interview, L.T. said her mother was in rehab for a couple of weeks, and during that time, they stayed with the Defendant. The Defendant's brother, his girlfriend, and baby stayed with them during this time. L.T. said the Defendant did not touch her "flower" while her mother was in rehab.

Katherine McConnell testified for the defense. She was the caseworker with the Department of Children and Family Services who worked with L.T. She

conducted an interview on June 17, 2009. She confirmed that during the interview, L.T. stated that her mother was in drug rehab only days before OCS became involved and that while her mother was in rehab, the Defendant raped her six or seven times over a period of six or seven days. Ms. McConnell recalled that L.T. told her that right before OCS took them, the Defendant would make her go in a room away from the other children and would make her have sex with him.

The Defendant argues on appeal that because L.T.'s testimony contained internal inconsistencies, conflicted with other testimony at trial, and was not supported by conclusive physical evidence, it was not sufficient to support the judge's finding of guilt. Specifically, the Defendant notes the following in support of his argument.

INCONSISTENCIES ABOUT WHETHER THE RAPES OCCURRED WHILE L.T.'S MOTHER WAS IN REHAB

The Defendant points out that in the victim's first interview on June 17, 2009, she told Ms. McConnell that the Defendant raped her while her mother was in rehab, but she then said in her Child Advocacy Center interview on June 24, 2009 that the Defendant did not touch her while her mother was in rehab.

L.T.'S INCONSISTENT STATEMENTS ABOUT WHEN THE LAST RAPE OCCURRED:

Next, the Defendant points out that the victim gave inconsistent statements about when the last rape occurred. L.T. reported to Dr. Hutchinson that the last rape occurred on May 13, 2009, but at trial, L.T. denied telling anyone this. Further, according to T.T., L.T. and the Defendant were not alone from Friday, May 8, 2009, until her arrest on May 13, 2009.

L.T.'S INCONSISTENT STATEMENTS ABOUT THE TIME PERIOD IN WHICH THE RAPES OCCURRED:

The Defendant notes that L.T. told her grandmother that she was raped while her mother was "stripping in the bars," but she told Ms. McDonnell that she was raped

while her mother was in rehab, just days before OCS's involvement. She also told Ms. McDonnell on June 17, 2009, that the rapes occurred six or seven times over a period of six to seven days. However, on June 24, 2009, she told the child advocacy interviewer that the rapes occurred while her mom was at work, not at rehab, and that one of the rapes occurred a few months before OCS removed her and her siblings from the home. At trial, L.T. denied telling anyone that the rapes occurred just prior to OCS's removal of her and her siblings, and she denied telling anyone that the rapes occurred over a period of six to seven days.

L.T.'S INCONSISTENT TESTIMONY ABOUT THE DETAILS OF THE RAPES:

L.T. told her grandmother that she did not bleed, but at trial, she testified she noticed blood after one of the rapes, and she denied telling anyone there was no blood. Additionally, during the interview with the child advocacy worker, L.T. consistently referred to her vagina as her "flower," but at trial, she called it her "cat" and denied ever referring to it as her "flower."

THE PHYSICAL EVIDENCE DOES NOT CONCLUSIVELY SHOW THAT A RAPE OCCURRED:

The Defendant points out that although L.T.'s hymen was not intact, Dr. Hutchinson found no tears, lesions, or scars. Dr. Hutchinson could not determine if L.T. was born without a hymen, as is the case with some women. Further, she noted that hymens can be injured or lost through activities such as playing and sports.

The Defendant contends that L.T.'s inconsistencies are troubling because they occurred so closely together and the victim's testimony, which was not supported by conclusive physical evidence, was the only evidence offered to support the finding of guilt.

This court was faced with a similar argument of inconsistent testimony in *State v. Schexnaider*, 03-144 (La.App. 3 Cir. 6/4/03), 852 So.2d 450, a case involving rape of a thirteen-year-old girl. On appeal, the Defendant claimed there was insufficient

11

evidence to convict him due to irreconcilable inconsistencies in the testimony at trial regarding the victim's recollection of details of the rape, whether the victim ate dinner with her family on the night of the incident, what clothes the victim was wearing when she was raped, and testimony by the victim as to how her clothes were removed during the rape. This court concluded:

> The inconsistencies pointed out by the Defendant do not concern the actual act of forcible rape. There are no contradictions in E.N.'s testimony regarding the actual act of forced intercourse with the Defendant. The trial court considered the testimony of all witnesses in this case and made a credibility determination that should not be second guessed by this court. Furthermore, "[t]he fact that the record contains evidence which conflicts with the testimony accepted by the trier of fact does not render the evidence accepted by the trier of fact insufficient." *State v. Holley*, 01-0254, p. 6 (La.App. 3 Cir. 10/3/01), 799 So.2d 578, 583, *citing State v. Tompkins*, 403 So.2d 644 (La.1981), *appeal after remand*, 429 So.2d 1385 (La.1982).

> The following is well settled:

>> The testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense. *State v. Hotoph*, 99-243 (La.App. 5th Cir.11/10/99), 750 So.2d 1036, 1045, *writ denied*, 99-3477 (La.6/30/00), 765 So.2d 1062 and 00-0150 (La.6/30/00), 765 So.2d 1066; *State v. Hawkins*, 99-217 (La.App. 5th Cir.7/2/99), 740 So.2d 768, 769; *State v. Hubbard*, 97-916 (La.App. 5th Cir.1/27/98), 708 So.2d 1099, 1104, *writ denied*, 98-0643 (La.8/28/98), 723 So.2d 415.

>> The credibility of a witness, including the victim, is within the discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *Id*. "[T]he *Jackson* standard does not serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the fact finder at trial." *State v. Juluke*, 98-341 (La.1/8/99), 725 So.2d 1291, 1293.

*State v. Williams*, 00-981, p. 7 (La.App. 5 Cir. 4/11/01), 786 So.2d 805, 810, *writ denied*, 01-1377 (La.3/28/02), 812 So.2d 646. The case sub judice is stronger than the ones cited above in that, in the case sub judice, the State introduced medical evidence which supported the victim's testimony.

We find no error by the trial court's choosing to believe E.N.'s testimony over that of the Defendant.

*Id.* at 456-57 (alterations in original).

The inconsistencies pointed out by the Defendant do not concern the actual act of aggravated rape. Further, although the medical evidence did not conclusively establish that a rape occurred, it supported the victim's testimony. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the offenses proven beyond a reasonable doubt. Accordingly, this assignment of error has no merit.

## PRO SE ASSIGNMENT OF ERROR

In his pro se brief, the Defendant focuses on Dr. Hutchinson's testimony that the victim had no hymen and some women are born that way. Additionally, he notes there was no evidence of any tears, lesions, scars, or bruising. He contends this evidence, combined with the internal inconsistencies in the victim's testimony, does not support the convictions in this case. For the reasons discussed in the foregoing assignment of error, the court finds no merit to this claim.

## ASSIGNMENT OF ERROR NUMBER TWO

The Defendant contends he was given incorrect information concerning the time limitation for filing an application for post-conviction relief when he was told he had the right, "within the next two years, to file motions for post-conviction relief if you find that something was not done properly in your case." The State agrees, noting the court failed to inform the Defendant that the two-year time limitation runs from the finality of conviction and sentence. Accordingly, the trial court is instructed to inform the Defendant of the correct provisions of Article 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of the opinion and to file written proof in the record that the Defendant received the notice. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

13

## DISPOSITION

The Defendant's convictions are affirmed, and the trial court is instructed to inform the Defendant of the correct provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of the opinion and to file written proof in the record that the Defendant received the notice.

**AFFIRMED WITH INSTRUCTIONS.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules-Courts of Appeal. Rule 2-16.3.